UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**J.D. SMITH, JR., CHARLES W. PIQUET, ALFONSO
DAVIS, LOUIS B. EUDELL and CHERI
MARTIN-WEATHERLY,**

                         **Plaintiffs,**


             **-v-**                          **5:00-CV-1151**

**NEW VENTURE GEAR, INC., DAIMLERCHRYSLER
CORPORATION, Mike Allen as President of UNITED
AUTOMOBILE, AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA LOCAL 624,
Stephen Yokich as President of UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW INTERNATIONAL
UNION, and UAW LOCAL NO. 624,**

                         **Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

K. Felicia Davis, Esq.
P.O. Box 591
Syracuse, New York 13201
Attorney for Plaintiffs J.D. Smith, Jr., Charles W. Piquet,
Alfonso Davis, and Cheri Martin-Weatherly

Stewart L. Weisman, Esq.
8060 Shadow Rock, Box 598
Manlius, New York 13104
Attorney for Plaintiff Louis B. Eudell, II

Hancock & Estabrook, LLP
John T. McCann, Esq., of Counsel
Lindsey Helmer Hazelton, Esq., of Counsel
1500 AXA Tower I
Syracuse, New York 13221
Attorneys for Defendants New Venture Gear, Inc.
and DaimlerChrysler Corp.

Blitman & King LLP

Kenneth L. Wagner, Esq., of Counsel
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204
Attorneys for Defendants Mike Allen as President of United
Automobile, Aerospace and Agricultural Implement Workers
of America Local 624, Stephen Yokich as President of United
Automobile, Aerospace and Agricultural Implement Workers
of America, UAW International Union, and UAW Local No. 624

**Hon. Norman A. Mordue, Chief U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

In this action alleging race and gender discrimination, there are three motions presently before the Court: first, a motion to sever (Dkt. No. 137) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. (collectively, "NVG"); second, a motion for summary judgment (Dkt. No. 139) by NVG; and third, a motion for summary judgment (Dkt. No. 140) by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624 ("Local 624"), Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International Union") (collectively, "union").  For the reasons set forth below, the motions for summary judgment are granted and the second amended complaint (Dkt. No. 39) is dismissed in its entirety.  The motion to sever is denied as moot.

## APPLICABLE LAW

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc*., 448 F.3d 573, 579 (2d Cir. 2006) (internal quotation marks omitted).  A material fact is one that would "affect the

outcome of the suit under the governing law," and a dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The Local Rules of the Northern District provide a procedural framework for the resolution of summary judgment motions, placing the burden on the parties to present the evidence that either supports or defeats the motion.  The movant must first submit a Statement of Material Facts setting forth the undisputed facts upon which it relies and specific citations to the record where each fact is established.  See N.D.N.Y.L.R. 7.1(a)(3).  The court must satisfy itself that the cited record evidence supports the movant's assertions of fact and that those facts show that the movant is entitled to judgment as a matter of law; a Statement of Material Facts is not a substitute for evidentiary proof of the facts.  *See Zhanghi v. Incorporated Vill. of Old Brookville*, 752 F.2d 42, 47 (2d Cir. 1985); *New York State Teamsters Conf. Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005).

Once the movant submits a properly supported Statement of Material Facts, the non-moving party must file a response thereto.  "Any facts set forth in the [movant's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  N.D.N.Y.L.R. 7.1(a)(3).  The Second Circuit has endorsed this rule, noting: "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'"  *New York State Teamsters*, 426

F.3d at 649 (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)).

        The submissions on behalf of plaintiffs Davis and Martin-Weatherly do not comply with these rules.  In many instances, citations to the record appear only in the Memorandum of Law, not in the Statement of Material Facts.  The Memorandum of Law contains numerous factual assertions which have no citation to the record and no support in the Statement of Material Facts.  Further, some factual assertions found in the Statement of Material Facts and/or Memorandum of Law are not supported by the cited portions of the record.

        The submissions on behalf of plaintiffs Davis and Martin-Weatherly in this unwieldy case – in which five plaintiffs are joined despite the paucity of significant common factual grounds for their claims, and in which many hundreds of pages of evidence have been placed before the Court – exemplify the need for organized presentation of arguments and clear citations to the record.  These are needed not only to guide the Court but to enable moving counsel to reply to plaintiffs' submissions.  The Court has reviewed all the evidence cited to it by the parties, including all cited portions of the depositions.  The Court has not, however, dissected the entire record to determine whether somewhere there may be uncited factual evidence that might support plaintiffs' claims, nor has it attempted to discern whether evidence cited by a plaintiff in one context might support some other argument as to which it was not cited; such an onerous exercise would exceed the Court's proper role and could well be prejudicial to opposing parties.

### PLAINTIFF J.D. SMITH, JR.

        The allegations in the instant action with respect to plaintiff J.D. Smith, Jr. are virtually identical to, and arise from the same events as, those in *J.D. Smith, Jr. and Charles W. Piquet v. New Venture Gear, Inc., DaimlerChrysler Corp., Mike Allen as President of United Automobile,*

*Aerospace and Agricultural Implement Workers of America Local 624, Stephen Yokich as*

*President of United Automobile, Aerospace and Agricultural Implement Workers of America*,

Action No. 99-CV-2086, decided by this Court on September 30, 2007.[1]  For the reasons set forth

in the Memorandum-Decision and Order granting defendants' motions for summary judgment

dismissing Action No. 99-CV-2086, the Court holds that NVG and the union are entitled to

summary judgment dismissing Smith's claims herein.

### PLAINTIFF CHARLES W. PIQUET

The claims in the instant action of behalf of plaintiff Charles W. Piquet are essentially the

same as, and arise from the same events as, those in *J.D. Smith, Jr. and Charles W. Piquet v. New*

*Venture Gear, Inc., DaimlerChrysler Corp., Mike Allen as President of United Automobile,*

*Aerospace and Agricultural Implement Workers of America Local 624, Stephen Yokich as*

*President of United Automobile, Aerospace and Agricultural Implement Workers of America*,

Action No. 99-CV-2086, decided by this Court on September 30, 2007.  For the reasons set forth

in the Memorandum-Decision and Order granting defendants' motions for summary judgment

dismissing Action No. 99-CV-2086, the Court holds that NVG and the union are entitled to

summary judgment dismissing Piquet's claims herein.

### PLAINTIFF ALFONSO DAVIS

**Second amended complaint**

In the second amended complaint (Dkt. No. 39), plaintiff Alfonso Davis, a black man,

---

[1]

The second amended complaint purports to add "supplemental allegations" on behalf of Smith against NVG in paragraphs 199 and 200; however, even assuming that these allegations could support a claim against NVG, such a claim could be asserted only by Smith's wife, who is not a party.

states that he began working for NVG, an automobile parts manufacturer, in 1996; that on October 22, 1998, he and other black workers signed a letter alleging discriminatory treatment by supervisor Michael K. Sculley; and that thereafter, Sculley's discriminatory treatment intensified and "was apparently condoned by Area Manager, Rick Slowick." Davis alleges that on October 31, 1998, Slowick called him into his office, berated him, and "accused him of creating a hostile work environment which plaintiff interpreted as retaliation for the October 22, 1998 letter[.]"

The second amended complaint further describes an incident occurring on March 3, 1999, as follows. Davis arrived at his work area at 11:09 p.m., nine minutes late. Jason Wicks, a white temporary worker, was standing at Davis' work station. Davis asked Wicks to move away to allow Davis to work at the station, but Wicks refused to move, stating that Sculley had told him to work there. Davis states that when he persisted in attempting to work at the station, Wicks used a racial slur and "moved very aggressively and stepped into Plaintiff Davis' face." The second amended complaint further alleges that Davis "told Wicks in clear terms to back up and lifted his hands to ward Wicks off." Davis says that "[a]t no time did [he] make physical contact with Wicks' person." Davis was then called to Slowick's office, terminated, and walked from the premises without any investigation. After union intervention, the termination was modified to 33-day unpaid suspension; accordingly, Davis was out of work from March 4, 1999 to April 7, 1999. He states, upon information and belief, that Wicks was suspended for some days and then hired full time.

Davis also says in the second amended complaint that after his return to work he began to experience racially motivated treatment from white coworkers. For example, Davis says, he "was hit by [a] component part thrown, had cigarette smoke blown into face, etc." According to Davis,

Sculley condoned such conduct and did not discipline the coworkers.

In the second amended complaint, Davis further claims that he "had been (unofficially) written up by Mike Sculley for things that, upon information and belief, similarly situated non-Black workers on the line were never confronted about or written up for." As an example, Davis relates the following incident. On or about February 26, 2000, Davis was ill and had been seen by the plant nurse. He informed his supervisor, Tom Dickinson, that he would remain until 3 a.m. and then go home. At 3 a.m., the supervisor was not in the area and at 3:07, Davis left the plant. He was written up and suspended for unauthorized leave. Davis states upon information and belief that on September 3, 2000, a white employee, David Silver, told supervisor David Hogan that he had been released to go home. When it was discovered that Silver had lied about being released, Silver was not suspended for unauthorized leave.

Davis claims NVG subjected him to racially discriminatory discipline, racially hostile work environment, and retaliation for complaining about racial discrimination. He claims the union discriminated against him and breached its duty of fair representation based on his race.

The second amended complaint can be read to state causes of action on behalf of Davis against NVG under 42 U.S.C. § 1981 ("section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); New York's Human Rights Law, N.Y. Exec. Law § 296; and other state law claims. As against the union he asserts causes of action for racial discrimination under section 1981 and Title VII, as well as breach of contract and breach of the duty of fair representation. *See* 29 U.S.C. §§ 158(b)(1)(A); 185.

**NVG's motion, generally**

In support of its motion for summary judgment dismissing Davis' claims against it, NVG

submits the affidavit of Andrew J. Quinn, Human Resources Coordinator and Labor Relations Representative at NVG during the times in question.  According to Quinn, NVG employed about 3,500 hourly workers.  About 17% of these, approximately 600, were minorities.  Quinn's responsibilities included addressing personnel issues such as termination, discipline, labor relations, and benefits, as well as investigating complaints of discrimination and harassment.  He avers that he is familiar with the facts and circumstances surrounding this action.  Quinn states that NVG maintains a "Zero Tolerance" policy prohibiting discrimination or harassment in the workplace, and discipline at NVG is administered equally to minority and non-minority employees based on the severity of the situation and the individual facts of each case.  Quinn adds that NVG maintains Standards of Conduct applicable to all employees prohibiting "fighting, horseplay, or other disorderly, disruptive, or unruly conduct."  The standards are distributed at orientation and posted on bulletin boards throughout the plant.

NVG also submits affidavits and relies on deposition testimony from various supervisors and coworkers having first-hand knowledge of the incidents in issue.  These, along with Davis' responses, are discussed below where relevant.

**Racially discriminatory discipline**

*The March 3, 1999 altercation with Wicks*

Davis claims that his March 4, 1999 suspension stemming from the altercation with Wicks on the previous day was racially discriminatory.  The same legal standard is applied to claims of race discrimination under Title VII, section 1981, and New York's Human Rights Law.  Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), plaintiff is required to prove a *prima facie* case of discrimination by showing membership

in a protected class, possession of basic skills necessary for the job, an adverse employment

action, and circumstances giving rise to an inference of race discrimination.  *See Slattery v. Swiss*

*Reins. Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).

Where a plaintiff has made out a *prima facie* case, the burden of production shifts to the

employer to articulate a legitimate, nondiscriminatory reason for its actions.  *See Bickerstaff v.*

*Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999).  The defendant's burden of production is not a

demanding one; it need only offer an explanation for the employment decision.  *Id.*

The burden then shifts back to the plaintiff to show "that the proffered reason was not the

true reason for the employment decision, and that race was."  *Id.* (internal quote omitted).  "The

plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then]

merges with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of

intentional discrimination (*i.e.*, that an illegal discriminatory reason played a motivating role in

the adverse employment decision)."  *Id.* at 446-47.

NVG argues that Davis fails to meet the fourth element required to make out a *prima facie*

case, because he presents no evidence of circumstances giving rise to an inference of race

discrimination in connection with his March 4, 1999 suspension.  NVG further argues that, even

assuming that Davis has made out a *prima facie* case, NVG has clearly met its burden of

articulating a legitimate, nondiscriminatory reason for its actions, *i.e.*, Davis' conduct in the

altercation with Wicks, and Davis has not adduced any evidence upon which a trier of fact could

find that he was the victim of intentional discrimination.

In its Statement of Material Facts pursuant to N.D.N.Y. L. R. 7.1(a)(3), NVG states: "On

or about March 4, 1999, Plaintiff Davis was terminated for pushing co-worker Jason Wicks in

violation of the Standards of Conduct." In support of this statement, NVG relies on Quinn's

affidavit as follows:

> As set forth in ... the Complaint, Plaintiff Davis was involved in an altercation with a coworker, Jason Wicks on March 3, 1999. The Union Representatives present for this incident were Carl Osborne and Vinnie Pagano. On this occasion, Davis had reported to the line late and was directed by his supervisor, Sculley to perform a different job as another employee (Wicks) had been assigned to cover his job. Subsequent investigation indicated that Davis caused physical contact to Wicks using his arms when Wicks refused to move off the job, having been directed to perform it by his supervisor. Other employees working at the time corroborated Wicks' complaint against Davis. Keith Nelipowitz witnessed Davis push Wicks. Beverly Carter, an African American employee, also witnessed Davis "move him out of his face".... It should be noted that no witnesses, including Carter, reported that Wicks used any racially offensive language towards Davis. It was the Company's determination that Davis had violated the Standards of Conduct by engaging in a physical confrontation and, as a result, he was terminated. However, as in all cases of grieved disciplines, we reviewed Davis' termination with the Union. It was agreed in the second step of the grievance procedure to return Davis to employment after thirty-three (33) calendar days. Davis resumed work at New Venture Gear on April 7, 1999.

(Paragraph numbering and references to record omitted.)

Sculley, who supervised Davis at the times in question, explains the Wicks incident in his

affidavit as follows:

> On the evening of March 3, 1999, Davis was late to the line which caused me to assign another employee to do his job. This was not uncommon as it was my practice to fill open positions for late or absent employees in order to get the assembly lines running. On this occasion, Davis had not called to say he was going to be late and I had no idea when to expect him. I instructed Jason Wicks to fill Davis' position on the line. It was subsequently reported to me that after Davis arrived, he shoved Wicks and threatened to beat him up in the parking lot. A subsequent investigation that evening confirmed this and Davis was escorted out of the plant. Wicks was not suspended as there was no indication that he was the aggressor in this incident or otherwise acted inappropriately. To the contrary, all Wicks did was attempt to perform the job that I directed him to do.

-10-

Attached to Quinn's affidavit are unsworn statements written by Wicks and coworkers Keith Nelipowitz and Rick Schwartz shortly after the incident, and one written by Beverly Carter about a week later.  Wicks's statement supports Quinn's and Sculley's affidavits regarding the outcome of the investigation of the incident.  Wicks states: "[Davis] continued to tell me to get out of his face approaching closer at which time he pushed me once and the parts flew out of my hand."  Wicks adds that Davis threatened to beat him up and "said he would see me outside at seven outside the gates."  Nelipowitz, who saw the incident, states that Davis pushed Wicks and said he would see him outside after work.  Schwartz did not see the incident but heard the verbal exchange.  Carter states that Davis "move[d] [Wicks] out of his face (not push)."  None of the witnesses states that Wicks pushed Davis or made any aggressive physical contact with Davis, nor does any witness support the allegation in the second amended complaint that Wicks used a racial slur.  Thus, the written statements show that, based on its investigation, NVG had a legitimate reason to conclude that Davis had violated the Standards of Conduct.[2]  Quinn's description of NVG's conduct in relation to the incident is also supported by the discipline and grievance documentation attached to his affidavit.  In sum, NVG has demonstrated that it had a legitimate nondiscriminatory reason for its handling of the Wicks incident.

The Court thus turns to consider whether Davis has come forward with evidence that the reason given was merely a pretext, that is, that it was not the true reason for the employment decision, and that race was.  Davis relies in part on his deposition testimony regarding the Wicks

---

[2]

The unsworn statements are not in admissible form.  However, the Court relies on them not for the truth of the matters stated therein but rather as showing what NVG relied on in reaching its determination.

incident.[3]  In his deposition, Davis admitted that he was late arriving at his work station.  Davis

---

Davis' testimony is confusing and seems to state that Sculley was present throughout the exchange.  He testified:

> Q. As part of your testimony, you just said that you told Jason Wicks to go see Mike Scully when he wouldn't get off the job.
> A. Yes.
> Q. Now, isn't it true that Mike Scully had already been to the job?
> A. No. Mike Scully came when Jason Wicks and I were convers[ing].
> Q. Okay.
> A. Before - - Before Mike Scully came is when I told Jason Wicks he need[ed] to go see Mike Scully. Mike Scully wasn't on -- he wasn't there at the start, when Jason Wicks called me a nigger. Mike Scully wasn't there when the argument took place when I told him he needed to go see Mike Scully.
> Q. I understand he wasn't there, but he wasn't - - When was the first time you saw Mike Scully that day?
> A. Mike Scully came some time after the conversation between Jason Wicks and myself.
> Q. Okay. Now I -- I understand that's your recollection. But looking at your memo now and ... it's fair to refer to that to refresh your recollection. Isn't it true that what actually happened is Mike Scully was there at the outset of the job and told you to get off the job?
> A. Yes. Yes.
> Q. Isn't it true that Jason Wicks was standing right there when Mike Scully told you that?
> A. Yes. He was there.
> Q. Isn't it true that you responded to Mike Scully that you were going to do your job?
> A. Yes.
> Q. Isn't it true then that you disobeyed a direct order from your supervisor, Mike Scully, to get off the job?
> A. No.
> Q. Why is that not true?
> A. Because according to the agreement between the company and the union, a part-timer has no rights over a full-timer.
> Q.  I understand - -
> A. Mike Scully knew that.
> Q. I understand that, but that wasn't my question. Isn't it true that you disobeyed a direct order from your supervisor, Mike Scully - -
> A. No.
> Q. - - to get off the job?
> A. No.
> Q. Why is that not true?
> A. Because according to the agreement between the company and the union, a part-timer has no rights over a full-timer.
> Q. Okay. I understand you think you were justified in your actions. That's not my question. My question is, isn't it true that you disobeyed a direct order from your supervisor, Mike Scully, to get off the job?
> A. No.
> Q. Why is that not true?
> A. I just told you why.

denied pushing or threatening Wicks.  Although he claimed that Wicks used a racial epithet,

Davis did not claim that Wicks touched or pushed him.

In her deposition testimony, Charryse Jones, a coworker who was working nearby when

the Wicks incident took place, described it as follows:

> Well, Alfonso came in a little late and Jason was on his job and Alfonso
> came in [and] said, I'm here, get off my job now.  And he I guess - - He
> didn't leave I know that.  I'm not sure if he left or came back.  It's a long
> time ago.  But he was there.  Alfonso said, you can leave off my job now,
> and he wouldn't leave and they got close, but they never hit each other.
> They were yelling.

When asked to explain her understanding of "the protocol when it comes to a line job where a

part-timer or weekend warrior [such as Wicks] is working and the full-time employee whose job

it is arrives" she stated "They have to get off the job as soon as they come over."

Beverly Carter, a coworker, described the incident in her written statement.  According to

Carter, Davis came in late and went to his position.  Wicks said to Davis "that he was not going

no - - - where."  Carter continued: "Alfonso put on his apron and started to set up his parts.  Jason

was not giving [Alfonso] no room.  Jason repeated that he was not moving.  Alfonso and Jason

exchange[d] unfriendly words.  Jason continue[d] to move in Alfonso['s] face then Alfonso

moved him out of his face (not push).  Jason got back up in Alfonso['s] face, they continued to

argue[.]"  Then management intervened.

In her deposition, when asked how Davis "moved" Wicks out of his way, she indicated

that Davis raised his hands up, palms outward, but did not push Wick.  According to Carter, it

was the practice that if a union employee such as Davis arrived late and his job was being done by

---

Q. Do you have anything to add to your testimony in response to my question?
A. No.

-13-

a "weekend warrior" like Wicks, the weekend warrior "immediately comes off the job" and allows the union employee to take over.  When asked whether this would be the case if the supervisor told the weekend warrior to run the job, she said "I don't know because I never had that happen."  Carter explained that it was her belief that Davis was "set up" because ordinarily the weekend warrior would immediately leave the job, and because when Davis came in "as the conversation was going on it was - - you could look at them [apparently meaning Davis' coworkers] and tell that they were just waiting, they were just waiting to see what Alfonso was going to do."

Davis complains in the Memorandum of Law that NVG's investigation was faulty because NVG did not interview certain black workers who worked near Davis' workstation, specifically Carter, Jones, and one "Mr. Shaw."  With respect to Shaw, the Memorandum of Law cites only to a page in the deposition of Paul Hawkins; this page does not mention Shaw.  As such, Davis cites to no evidence of what Shaw would have said if he had been interviewed.  Carter gave NVG her written statement a week after the incident, and presumably Jones, too, would have said that Davis did not push Wicks.  Davis also stated in his deposition that Paul Hawkins and a woman named Charmaine, both black, were in a position to see the incident.  Hawkins testified at his deposition that he did not see anyone hit anyone; he further stated that he was not looking at Davis and Wicks when they got into the altercation and that his job requires him to look at what he is doing "[a]ll the time."  The evidence does not show what Charmaine would have said if she had been questioned about the incident.  In any event, the fact that NVG accepted the version of the incident given by Wicks and Nelipowitz is not evidence that NVG acted in a racially discriminatory manner.  Davis' disagreement with NVG's handling of the incident does not

-14-

change the fact that NVG's action was based on firsthand statements from Wicks (the victim) and Nelipowitz (an eyewitness) that Davis had pushed Wicks.

As stated, NVG met its burden of articulating a legitimate, nondiscriminatory reason for its action in response to the Wicks incident.  Even assuming that Wicks used a racial slur and that Sculley's order was inconsistent with the usual practice in the plant, this would not support a finding that NVG's manner of dealing with the incident was racially discriminatory.  Likewise, even if in fact Davis did not push or threaten Wicks, the statements of Wicks and Nelipowitz nevertheless provided a legitimate nondiscriminatory basis for NVG's conclusion that Davis had violated the Standards of Conduct.  In other words, even accepting that NVG erred in its conclusion that Davis was the aggressor, such an error is not in itself evidence of discrimination.  Further, Carter's unsupported speculation that Davis was "set up" does not raise a material question of fact relative to this incident, nor is it evidence that NVG's proffered reason was false.  In sum, the evidence adduced by Davis with respect to the Wicks incident, viewed in a light most favorable to Davis, does not, without more, raise a material question of fact regarding whether an illegal discriminatory reason played a motivating role in NVG's handling of the incident.[4]

Davis further alleges that a dual system of racially disparate discipline existed, and argues that this disparate system of discipline lends support to his claim that discrimination was the true reason for NVG's handling of the Wicks incident.[5]  The Court now turns to the issue of a dual

---

[4]

Davis also claims that upon returning to work after his suspension for the Wicks altercation he began experiencing racially motivated treatment from white coworkers.  This claim, which is addressed in the Court's discussion of Davis' hostile work environment claim, below, does not support Davis' claim that NVG's handling of the Wicks incident was discriminatory.

[5]

To the extent that Davis' papers may be read to claim that he himself was the victim of racially

system of discipline.

_Dual system of discipline_

In support of his contention that the reason given by NVG was not the true reason for NVG's manner of handling the Wicks incident and that race was, Davis alleges that a dual system of discipline existed at NVG whereby minority workers were disciplined more harshly than non-minority employees. Davis points to some specific incidents at the plant and also relies on an expert report purporting to show by statistical analysis that the severity of disciplinary action at NVG was influenced by race and/or gender.

Quinn states in his affidavit that he was "directly involved in or had personal knowledge of most disciplinary actions which rose to the level of a disciplinary layoff or a termination." He says he has no reason to believe that minority employees were treated differently; discipline was administered according to the facts and circumstances of each individual case.

The second amended complaint includes the following allegations regarding a dual system of discipline:

> Upon information and belief, and based thereon, Plaintiffs allege, Defendants New Venture Gear and DaimlerChrysler have maintained an impermissibly dual system of discipline in that it imposed more severe disciplinary sanctions on Black employees than similarly situated non-Black employees.
>
> Plaintiff submits the following incidents as examples of the impermissible

---

discriminatory discipline in connection with other specific incidents in addition to the Wicks altercation – in particular the incident when he left work without authorization on February 26, 2000 – the Court addresses these incidents in the context of Davis' claim of a dual system of discipline at NVG. The Court finds no competent evidence on which a reasonable factfinder could conclude that similarly-situated white employees received more favorable treatment. Nor is there any other evidence that NVG's handling of other incidents involving Davis was racially discriminatory.

> dual system of discipline. Upon information and belief, in April 1999, Steven Rodafox,[6] Black male, and William McMaster, White male, engaged in a physical altercation. Mr. Rodafox was terminated while Mr. McMaster was not.
>
> Upon information and belief, David Stone, a White male, threatened to come in the plant with a gun to kill person(s) in management in May 1999. Mr. Stone was given three (3) months off, and then allowed to return to work.
>
> Upon information and belief, two White males, Jim Loveless and Jim Lazero, were observed fighting outside. The witness, a company engineer, reported the fight. Neither individual received time off.

(Paragraph numbering omitted.)  Davis also refers to the physical assault by plaintiff J.D. Smith, Jr., a black worker, upon James R. Reinhardt, a white coworker, which resulted in Smith's termination.  Smith ultimately pled guilty to second degree harassment as a result of the assault.[7]  Davis would have the Court compare the above alleged incidents with the Wicks incident and the Smith/Reinhardt incident and conclude that the differences in punishment are evidence of racially discriminatory discipline.

    With respect to the first alleged incident, Quinn states that NVG's investigation revealed that Steven Rohadfox had confronted William McMasters "on top of a platform and began to physically assault him leaving McMasters with no room for escape."  With respect to the second,

---

[6]

It appears that the correct spelling is "Rohadfox."  Throughout this Memorandum-Decision and Order, the Court has accurately reproduced the wording, spelling, and grammar in the quoted submissions rather than correcting or otherwise altering them.

[7]

The Court discusses the incident resulting in NVG's termination of J.D. Smith, Jr. in detail in *J.D. Smith, Jr. and Charles W. Piquet v. New Venture Gear, Inc., DaimlerChrysler Corp., Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America*, Action No. 99-CV-2086, decided by this Court on September 30, 2007.

-17-

it is obvious that a verbal threat made outside the plant to come into the plant with a gun to kill

people is not comparable to an actual physical altercation during working hours inside the plant.

Moreover, as Quinn points out, plaintiff J.D. Smith, Jr. admitted at his deposition that he once

made a threat that there would be a homicide at the plant and he (Smith) would be in prison as a

result; Smith was not terminated for the threat.  Thus, neither the threat by the white employee,

Stone, nor the threat by the black employee, Smith, resulted in termination.  And finally, with

respect to the allegation that two white men, Loveless and Lazero, were not punished for fighting,

Quinn states that he is not familiar with the incident and does not believe that, if it occurred, it

was brought to the attention of management.

Davis adduces no competent evidence raising a question of fact regarding Quinn's

explanations.  Davis fails to present any competent evidence that these incidents are sufficiently

comparable to the Wicks incident or the Smith/Reinhardt incident to enable a reasonable

factfinder to find racially disparate discipline.

In plaintiffs' Memorandum of Law in opposition to the motion, Davis refers to other

incidents as evidence that similarly situated white men engaged in physical confrontations and

were not disciplined.  The Memorandum of Law states:

> Mr. Davis is aware that similarly situated Caucasian males have engaged in
> physical confrontations with supervisors present and were not disciplined.
> Such similarly situated Caucasian males include Danny Fiore, Ron Reid,
> and Mike the truck driver in Department 863.

Neither the pertinent section of plaintiffs' Statement of Material Facts nor the pertinent section of

plaintiffs' Memorandum of Law cite to any evidence in support of the allegation that Danny Fiore

"engaged in physical confrontations with supervisors present and [was] not disciplined."  Not

-18-

surprisingly, therefore, defendants do not address it in this context.[8]

With respect to the incident involving Ron Reid and Mike the truck driver, plaintiffs'

Memorandum of Law states: "Ms. Martin-Weatherly testified that she witnessed Ron Reid and

Mike, the truck driver of Department 863 engage in a physical altercation in the presence of

supervisor Liz McLaughlin."  In fact, this statement misrepresents Martin-Weatherly's testimony.

A review of the deposition pages cited shows that Martin-Weatherly testified that there was an

exchange between Reid and "Mike that was 863's truck driver" and that Liz McLaughlin

"actually intervened and one of the gentlemen['s] shirt got ripped."  Counsel then asked: "Did

you witness this?"  Martin-Weatherly responded: "I did not."  Counsel then asked: "What is the

basis for your knowledge of that incident?" and she replied: "I spoke with Ron Reid about it. One

of the individuals who was involved."  This hearsay allegation is not competent evidence.

In response to this allegation, defendants submit the affidavit evidence of Elizabeth D.

Mauro (known at all pertinent times as Liz McLaughlin) stating that she supervised Martin-

Weatherly at the times in question.  McLaughlin explains:

> I am aware of an incident involving a truck driver in Department 862 by
> the name of Ron Reid and a truck driver in Department 863.  It is my
> understanding that Martin-Weatherly alleges that the other truck driver's

---

[8] In the section of her deposition cited by Davis regarding the allegedly disparate treatment of blacks and whites involved in physical altercations, plaintiff Cheri Martin-Weatherly stated that she was present when Danny Fiore "actually dragged Ron Reid off his truck" and that "nothing happened."  Presumably because this incident is not clearly referenced in plaintiffs' Memorandum of Law or Statement of Material Facts regarding Davis, defendants do not address it in this context.  Moreover, Mark A. Sposato, who was Martin-Weatherly's and Fiore's area manager at the times in question, states in his affidavit: "With reference to Martin-Weatherly's allegation ... that Fiore pulled a truck driver off his forklift in anger on or about August 16, 1999, Martin-Weatherly has her facts wrong.  Fiore was not involved in that incident."  In any event, there is insufficient evidence to support a finding that this alleged incident was in any way comparable to the incidents involving Davis or Smith.

name was Mike, but it was actually Guy Lamacchia. The incident took place on May 23, 1999. When I came upon the two of them, they were in a heated argument, which I had to break up.  I did not witness any striking or other physical contact between these two employees.  I recall that one of the employees, Ron Reid, had a rip in his shirt.  He told me that he ripped it on a machine.  Both employees denied that they had been fighting.  An investigation of the incident did not produce any witness to a fight. The employees were each given disciplinary action in the form of a one day disciplinary layoff for disorderly conduct.

Quinn's reply affidavit discusses the same incident as follows:

In May 1999 there was an incident between Ron Reid and a truck driver, Guy Lamacchia. Both employees were suspended pending investigation. Ms. McLaughlin had witnessed only a verbal argument between the two, not physical contact. Both Reid and Lamacchia denied any physical contact and there were no witness statements to support any physical contact. These two employees still received a disciplinary layoff for disorderly and disruptive conduct. ... Contrary to Plaintiffs' allegations, this was not an incident in which white employees received more favorable treatment. There was no evidence to support physical contact to support a discharge as there was in the incidents involving Plaintiffs Smith and Davis.

Copies of the disciplinary notices stemming from the incident are attached to Quinn's affidavit. In sum, the undisputed evidence is that no witness came forward to state that there was physical contact between Reid and Lamacchia.  Thus, as a matter of law, the Reid/Lamacchia encounter is not comparable to the Wicks incident or the Smith/Reinhardt incident and provides no support for Davis' claim of racially disparate discipline.

Quinn's reply affidavit describes another incident in March 1999 as follows:

There was another incident in March, 1999 involving a truck driver by the name of Mike, but Ms. McLaughlin was not the supervisor involved and the incident occurred in Department 261. In that situation, Ed Landers got into an altercation with truck driver Mike Rey on March 17, 1999. Again, both employees were suspended pending investigation. The investigation indicated this was a case of physical altercation and that Landers had bumped Rey with his chest. Landers was discharged. Rey received a 10 day

-20-

disciplinary layoff.  Both individuals are white.

Copies of their disciplinary notices are attached to Quinn's affidavit.

In the second amended complaint, Davis also states that he "had been (unofficially) written up by Mike Sculley for things that, upon information and belief, similarly situated non-Black workers on the line were never confronted about or written up for."  As an example, Davis relates the following incident.  On or about February 26, 2000, Davis was ill and had been seen by the plant nurse.  He informed his supervisor, Tom Dickinson, that he would remain until 3 a.m. and then would go home.  At 3 a.m., the supervisor was not in the area and at 3:07, Davis left the plant.  He was written up and suspended for unauthorized leave.  Davis states "upon information and belief" that on September 3, 2000, a white employee David Silver told supervisor David Hogan that he had been released to go home, and when it was discovered that Silver had lied about being released, Silver was not suspended for unauthorized leave.

With respect to Davis' suspension for leaving work without authorization on February 26, 2000, Quinn's affidavit states:

> In ... the Complaint, Davis alleges he was disparately disciplined for unauthorized leave as a result of a February 26, 2000 incident. On this occasion, Davis requested and was given permission to go the medical department from his supervisor Tom Dickinson at around 1:00 a.m. Davis returned from medical and worked until the 3:00 a.m. lunch break. He did not report back to work after lunch but instead clocked out of the plant at 3:07 without telling either Dickinson or Area Manager Rick Slowik he was leaving.

Attached to the affidavit are Dickinson's written report of the incident and an e-mail from area manager Rick Slowick to manager Jim Hickey, copied to Quinn, describing the incident.  There is nothing in these reports to suggest that the incident had anything to do with Davis' race.  Further, Davis does not deny leaving work at 3:07 a.m. on February 26, 2000 without telling Dickinson or

-21-

any other management representative that he was leaving, although he does claim he spoke to

Dickinson some time earlier and told him he would leave later.  Davis adduces no evidence

supporting his allegation "upon information and belief" in his second amended complaint that

Silver was treated more leniently for similar conduct; this unsubstantiated allegation does not aid

Davis on this motion.

The second amended complaint also refers to a letter written to management by Davis and

two other employees on October 22, 1998, claiming discriminatory treatment.  The letter claims

that white workers were allowed to leave work without requiring a nurse's excuse whereas black

workers had to get a nurse's excuse.  The one specific example given in the letter and referred to

in the second amended complaint concerned a white worker, "Kirk" or "Kurt."  The letter

describes the incident as follows:

> ... Kirk walked off the line at about 11:20 p.m.  He gave no reason, he was
> not excused by Scully or the nurse.  He just left.  From all that we know
> about procedure, he should have been suspended or perhaps even fired.
> However, he was allowed to return to work the next day as if nothing had
> ever happened.  He was not suspended or fired.

When questioned about the incident at his deposition, Davis testified that "Kurt" was allowed to

leave work "without going to medical."  Davis explained that he saw Kurt speak to Sculley, then

get his coat and lunch bag and go home.  Thus, it appears from Davis' testimony that Kurt

actually did speak to Sculley immediately before leaving.  On its face this is not comparable to

Davis' situation because Kurt spoke with a supervisor immediately before leaving, whereas Davis

did not.  Davis also acknowledged that he did not know what had taken place between Kurt and

Sculley earlier.  That Kurt was allegedly allowed to leave without "going to medical" does not

support a finding of disparate treatment, particularly in the absence of any evidence of the reason

-22-

for Kurt's departure.  There is no evidence that the Kurt incident was sufficiently similar to

Davis' February 26, 2000 incident to support a finding of disparate discipline.  In any event, even

assuming that Sculley was a more lenient supervisor than Dickinson in this respect, this in itself

would not support a finding of race discrimination.

> In his affidavit on this motion, Davis states with respect to disparate discipline:

> > There is a general policy at New Venture Gear plant that treats African
> > Americans differently when it comes to discipline. Behavior that I have
> > been disciplined for did not result in discipline for Caucasians.

> > Under the contract, any disciplinary infraction older than 12 months cannot
> > be considered by the company in implementing discipline. Therefore at any
> > given time, and at least once a year, workers should be on parity with each
> > other from the perspective of same discipline record. But it doesn't matter.
> > African Americans are going to be disciplined more severely.

> > For example, Mr. Mayfield, an African American employee at New
> > Venture Gear plant, was disciplined because he caught the error of a
> > Caucasian layout man. The company didn't discipline the set up man, but
> > penalized Mr. Mayfield. In this instance, Mr. Mayfield is a victim of
> > someone's conduct but he was disciplined as if he was the perpetrator.

> > The selective use of discipline disparately impacted me, and other African
> > Americans at the plant. The disparate impact cuts both ways. I will be
> > negatively affected if I am African American whether I am the victim in a
> > situation. I have been the victim in situations and instead of the Caucasian
> > aggressor being disciplined nothing is done.

> > So Caucasian perpetrators fare better under New Venture Gear discipline
> > because either they are not disciplined for conduct towards a Black
> > employee, or the Black victim [will] receive discipline. This was the case
> > when Keith Neplowitz' brother used abusive language towards me with the
> > supervisor standing right there.

(Paragraph numbering omitted.)  This highly conclusory recitation does not raise a question of

fact regarding racially discriminatory discipline and does not assist Davis in proving that NVG

had a discriminatory motive in its handling of the Wicks incident or in any other respect.  The

-23-

Court finds no citation to evidence of the Mayfield incident in the pertinent sections of plaintiffs'
Statement of Material Facts or Memorandum of Law, nor has the Court encountered such
evidence in its review of the record.

Defendants have adduced competent evidence that discipline at NVG was administered
according to the facts and circumstances of each individual case.  Davis responds with a number
of unsubstantiated and/or conclusory allegations and a few random anecdotes about factually
distinguishable incidents.[9]  As such, Davis' submissions do not raise a question of fact regarding
whether NVG handled the Wicks incident, the Smith/Reinhardt incident, any other incident
involving a black employee more harshly than comparable incidents involving white employees.
Davis' submissions, viewed in a light most favorable to Davis, would not permit a reasonable
factfinder to conclude that NVG administered discipline in a racially discriminatory manner.

_Statistical evidence_

In support of his contention that the reason given for his termination was not the true
reason for the employment decision and that race was, Davis also relies on a report dated
September 30, 2005, from Steven J. Schwager, Associate Professor of Biological Statistics at
Cornell College of Agriculture and Life-Sciences.  This report purports to show that the severity
of disciplinary action at NVG is influenced by race and/or gender.  A plain reading of the report
discloses that, as Dr. Schwager acknowledges, the data files used "omit most of the information

---

[9]

In the section of his Memorandum of Law on hostile work environment, Davis refers to an
altercation between coworker Melvin Flanagan (apparently a black man) and Larry Sealy
(apparently a white man), and asserts that Flanagan "was disciplined though he was the victim."
Consideration of this incident in connection with Davis' disparate discipline argument does not
assist Davis.  As discussed below in the hostile work environment section, Flanagan's own
testimony demonstrates that his punishment was minimal whereas Sealy was suspended for six
months.

necessary for examination of this question[,]" and "omit[] detailed information about the incidents that led to discipline." Nothing in the record suggests that plaintiffs made any effort to obtain further information. Dr. Schwager discusses the differences by gender and ethnicity in violation rates, which he says is statistically significant. Even accepting the validity of his statistical analysis, however, this difference in itself does not support an inference of discrimination, because it wholly fails to address other possible non-discriminatory reasons for the differences, such as differences in supervisors, departments, or types of infraction. Likewise, Dr. Schwager's report does not support a finding that whites are disciplined less harshly than blacks for the same violation; again, other factors are not taken into account, including, it seems, the employees' prior disciplinary records. On its face, the report does not provide evidentiary support for plaintiffs' claim of disparate treatment.

In reply, defendants submit a report from Bernard R. Siskin, who received a Ph.D. in Statistics from the University of Pennsylvania, and David W. Griffin, who received a Ph.D. in Economics from Cornell University. For the past 25 years, they have specialized in the application of statistical methods and economic theory to the analysis of various employment processes within the context of employment discrimination claims. This report discusses the defects in Dr. Schwager's analysis and concludes that his analysis of "violation rates" fails to meet the minimum professional standard for investigation of the question. The report further performs an alternative analysis that yields "absolutely no statistical evidence that employee race and/or gender are meaningfully correlated with the severity of discipline." Plaintiffs did not request an opportunity to rebut this report.

The statistical evidence relied on by plaintiffs fails to support a finding that NVG

-25-

administered discipline in a racially discriminatory manner.  As such, it does not raise a question of fact in the face of NVG's evidence that its handling of the Davis/Wicks incident was not discriminatory.

*Conclusion*

Viewing the evidence in a manner most favorable to Davis and in the light of all of the evidence upon which he relies (including the evidence discussed below in connection with the allegedly hostile work environment), there is no ground to find that an illegal discriminatory reason played a motivating role in NVG's discipline of Davis for the Wicks incident or in any other respect.  NVG is entitled to summary judgment dismissing Davis' race discrimination claim.  **Hostile work environment**

To make a showing of a hostile work environment sufficient to withstand summary judgment, a plaintiff must produce evidence "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Richardson v. N.Y. State Dept. of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (internal quotation marks and citations omitted).  The first element of a hostile work environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks and citation omitted).  Not all workplace harassment is prohibited; rather, the law prohibits only conduct involving statutorily proscribed forms of discrimination.  *See Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001)

-26-

(citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Thus, courts "consider the extent to which the conduct occurred because of plaintiff's [membership in a protected class]."  *Demoret v. Zegarelli,* 451 F.3d 140, 149-50 (2d Cir. 2006).

To analyze a hostile work environment claim, courts "look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.* at 149 (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993)).  For discriminatory comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents or episodic conduct.  *See Richardson*, 180 F.3d at 437.  Because a hostile work environment claim focuses on the nature of the workplace environment as a whole, evidence of discriminatory harassment and hostility beyond that which is directed specifically at the plaintiff is relevant to the analysis.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  Similarly, the fact that a plaintiff was not present when a racially hostile incident occurred does not necessarily render the incident irrelevant to his or her hostile work environment claim.  *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997).

In moving for summary judgment dismissing Davis' claim of hostile work environment, NVG relies on Quinn's affidavit that NVG maintains a "Zero Tolerance" policy prohibiting discrimination or harassment in the workplace, that discipline at NVG is administered equally to minority and non-minority employees based on the severity of the situation and the individual facts of each case, and that NVG maintains Standards of Conduct applicable to all employees.

In support of his claim that he endured a hostile work environment, Davis first alludes to

-27-

offensive graffiti, racial epithets, and hangman's nooses in the plant.  Although the Memorandum of Law alludes to a "recurrent appearance of hangman's nooses," it cites only to the deposition of coworker Zachary Oliver, who testified to a single incident occurring in April 2000.  According to Oliver, he saw a noose draped over a pipe at a wash station.  Quinn's affidavit states that the incident was thoroughly investigated by NVG, which found no evidence that anyone had intended to display the rope as an actual noose or that it was directed towards any individual or group.  The UAW International Union sent representatives to the plant from Detroit to review the situation, and they agreed that NVG had handled the situation appropriately and that no further action was required.

With respect to racial graffiti, Davis' Memorandum of Law cites to the deposition testimony of coworker Dixie Cole that on one occasion he observed a reference to KKK written on a piece of cardboard.  Cole added that when he reported this, NVG management investigated and caught the perpetrator.  Davis' Memorandum of Law also cites to pages of deposition testimony of Melvin Flanagan, a black coworker.  When asked whether he saw racial graffiti at the plant, Flanagan replied that when he first started working at the plant in 1971 he saw some racial graffiti, but "not towards the later years."  He further testified that he hadn't seen any "for the last ten years."

With respect to racial jokes, in his own affidavit, Davis states: "I have heard racial jokes while working in the plant, and seen written jokes being [passed] around. Same of the ones that I remember involved references to Blacks as coons, eaters of watermelon, and fried chicken."  He gives no specifics as to time, place, or frequency.  Davis' Memorandum of Law also cites to the deposition testimony of Flanagan, who, when asked whether he ever heard racial statements and

-28-

jokes, said "not really, only because the people that would be telling them wouldn't be telling them around me."  Davis cites to the testimony of Oliver that he was called racially offensive names by coworkers in 1994 or 1995; Oliver testified that he did not report the comments.  Davis also cites to the testimony of Douglas Medley, Jr. (apparently a black man), who stated generally that there was racial joking and graffiti in the plant.  Medley could only remember one specific incident, which occurred three or four years previously, when a white coworker called him an "ape"; he did not report it.

In addition, with respect to racial epithets, Davis states in his Memorandum of Law that he was called "nigger" on one occasion by Gil Odjeck (a union official), once by Wicks in the context of the incident resulting in Davis' suspension, and once by Carl Osborne (an alternate union official).  The evidence regarding Wicks' alleged racial epithet is discussed above in the section regarding racially discriminatory discipline.  With respect to the other two alleged epithets, there are no citations to the record, nor is the allegation set forth in the Statement of Material Facts.  In his affidavit, Davis relates one other incident:

> The last time that Mr. Sculley came over Mr. Nelipowitz' brother began cursing about the situation [apparently referring to Davis' complaints about smoking on the line, discussed below] and called me a "black bastard". When I asked Mr. Sculley if he was going to allow this language to stand he told me that he considered it "shop talk." Mr. Sculley allowed the abusive language and did not discipline this individual.

Davis shows no basis for imputing to NVG the union officials' two alleged isolated racial slurs. With respect to Sculley, it is significant that Davis stated in his deposition that he had never heard Sculley use a racial epithet towards him.

In his Memorandum of Law, Davis also argues that "the disparate discipline of African American workers creates an objectively hostile work environment."  Here Davis cites to

-29-

Flanagan's deposition testimony regarding an altercation with Larry Sealy (apparently a white man). Flanagan stated that Sealy pushed him, that both men were "walked out" of the plant, that Flanagan was suspended for about a week and eventually was paid for the time he was out (although he claims he was paid at an improperly low rate), and that Sealy was suspended for about six months. This evidence does not show that Flanagan was treated more severely than Sealy or, indeed, was punished in any significant way. Davis also cites to the testimony of Lorenzo Davis in support of the proposition that the "disparate discipline of African American workers creates an objectively hostile work environment." Lorenzo Davis acknowledged, however, that he had no personal knowledge of the circumstances surrounding the discipline of minority employees. These are the only examples of disparate discipline cited in support of the hostile work environment claim. Further, with respect to the examples of disparate discipline cited in connection with the racially discriminatory discipline claim, the Court has already found that they amount to no more than unsubstantiated and/or conclusory allegations and a few random anecdotes about factually distinguishable incidents. They do not assist Davis in his effort to show a hostile work environment.

On the subject of hostile work environment, the Memorandum of Law next refers to a letter written on October 22, 1998, to union  President Mike Allen from Davis, Dwayne Shaw, and Sean Hamilton. It was copied to Jerry Mallory, Vice President of Operations of NVG, and Tom Neal, Chair of the Human Rights Committee of the union. The letter states in full:

> It is our belief and p[er]ception that our foreman, Mike Scully, on line 863, has a problem with African-Americans. On several occasions, we have watch[ed] what we feel has been strategic singling out of African American workers on the line. Here are some examples that make the discrimination evident.

-30-

For example, when the line is on break, Scully will wait at the line until all the Black workers return, and then leave and go to his office. Though our White counterparts have not fully returned, it appears that he feels that he does not have to supervise their return. It is as if he does not trust us to return to work on time, but does not have the same concern about the White workers. This is a practice that does not make sense unless Scully has decided that the Black workers on the line must be treated different than their White counterparts.

Another example is when White line workers have wanted or needed to go home, he/she were excused without a problem. Whereas, when a Black line worker needed to leave, it was required for that individual to go to the nurse to get an excuse versus just being excused.

A third example is when Kirk walked off the line at about 11:20 P.M. He gave no reason, he was not excused by Scully or the nurse. He just left. From all that we know about procedure, he should have been suspended or perhaps even fired. However, he was allowed to return to work the next day as if nothing had ever happened. He was not suspended or fired. In contrast, when Armen was unable to physically drive the truck because of pregnancy, she was fired. Though there are some differences between examples, the gist is that Black workers and White workers are not treated the same by Scully.

We realize that certain situations can come up. That is not what we are talking about. What we are talking about is a constant course of conduct by Scully that feels very much like discrimination. As you can imagine, such practices are unfair and have created much tension on the line.  Something must be done about this problem.

Quinn discussed this letter in his affidavit as follows:

I note that letter was sent just after Davis had received a written warning from Mr. Sculley for excessive personal time (10/17/98) and a Department Managers Report for poor quality workmanship (10/19/98). The letter did not state that this discipline was unjustified or discriminatorily issued. While the letter did not contain any request for Mr. Mallory to investigate or take any actions, then-Employment Supervisor Billy Owens reviewed the allegations with Mr. Sculley and, to my recollection, found no problems or basis for corrective action. Mr. Owens is African-American and has since retired. The UAW Civil Rights Committee also investigated the allegations and found no basis for discrimination. Carolyn Wingate, the mother of one of the three employees who signed the letter, Sean Hamilton, was on the Civil Rights Committee at the time.

-31-

In the Statement of Material Facts, Davis denies that the October 22, 1998 letter had any connection with the discipline he received on October 17 and 19, 1998.

In his affidavit in support of NVG's motion, Sculley states:

> From day one, Davis was a difficult employee who was regularly insubordinate towards me. He called me "cracker" and "white boy" and a "racist devil" and told me to "get the f___ out of his face." I was a relatively new supervisor at this time. At the outset, it was my impression that Davis was trying to intimidate me, but as time went on it appeared that Davis was reacting to my efforts to enforce the rules. Davis was late to the line and late back from breaks more than anyone else on the line. I enforced the rules for both white and minority employees. Davis' response was to try to brand me as a racist. I am not.

Davis' affidavit does not deny Sculley's statement that Davis used racial epithets towards him.

With respect to Sculley's monitoring of the line, Davis' affidavit states:

> Mr. Sculley's office was near the front of the line. From this area, he could see the whole line with the exception of into the test buck. The center of the line did not offer a better vantage point. You could not see each [end] of the line clearly because the machinery ... hung between my area and the various ends of the line. Mr. Scully used the center of the line as his vantage point to view the several African Americans whose job operations were clustered in the center there.

In this respect, the Memorandum of Law cites to pages in the depositions of Sean Hamilton, Charryse Jones, Beverly Carter, Paul Hawkins, and J.D. Smith, Jr.  On the cited pages, Hamilton testified that Sculley would watch him and Davis while "the white guy, Brian Peyat, he's over there at the next line talking with somebody[.]"  Hamilton also testified to an incident where he got back from break, saw the line was not moving, and ran to the bathroom.  When he came back from the bathroom, Sculley asked why he was late.  Hamilton was not disciplined, but nevertheless felt that Sculley did not believe his explanation that he had already been back from break.  Hamilton testified in part:

-32-

Q. Do you have any reason to believe that Mr. Scully did not accept your explanation that you had been to the bathroom?

A. Oh, yes. I mean, he -- he would think that, you know, I was probably using it as an excuse not to get written up....

Q. But if Mr. Scully didn't write you up, why did you believe he didn't accept your explanation?

A. Just, I mean, with his conversation, it's like, well, how do I know you telling me the truth or not? I'm like, you can go ask Jeff Harris, you can ask anybody on the line if I came back to break on time.

Q. Do you know if he did that?

A. I have no idea if he did it or not....

Hamilton also stated that Sculley would watch and see who left first for break and who came back last.  And Hamilton speculated that other white workers on the line would report to Sculley if the black workers returned late from break.

Charryse Jones, when asked: "Did you ever observe Mr. Scully monitoring the return of African American employees back to the assembly line...?" responded, "Yes."  In the pages of Jones' testimony provided to the Court, Jones states only that she saw Sculley monitoring the return to the line of black employees; she does not state that he did not monitor the return of white employees or that he monitored them less than blacks.

Beverly Carter testified that Sculley monitored black employees more than whites.  She said she complained to Sculley but not to the union or anyone else at NVG.

Paul Hawkins testified: "[T]hey was watching [Davis] while he was doing his job and stuff, it was a lot of focus on him for some reason."  In the pages of his deposition cited by Davis, J.D. Smith, Jr. testified that on one occasion about two years previously he saw a "tall, skinny" supervisor follow Davis to the bathroom.  Smith did not know anything more about the incident

-33-

except that it "seemed like" Davis was being followed.

With respect to the averment that he watches black workers on the line more closely than white workers, Sculley's affidavit states:

> It was my practice to stand in the center of the line periodically to monitor breaks or otherwise observe employees' performance on the line. Alfonso Davis did work near the center of the line. I chose the middle not because of which employees worked there, but because I had the best view of the whole line from that middle location. When it appeared to me that everyone on the line had come back and started to work, I would typically leave and move on to something else.  To the extent that Davis, Hamilton or Shaw, (the signatories to the letter) were frequently the last ones to return to the line (and I recall that they were), it may very well have appeared to them that I was waiting for them. However, I could not control the order in which employees returned.

Dwayne Shaw, a black employee and signatory to the October 22, 1998 letter, stated in his deposition: "I always came back late [to the line after break].  And it seemed every time I get back to the line, [Sculley] leaves.  So, I don't know if – to be honest, if he was waiting just for me or all the black workers or everybody."  Asked whether he ever saw Sculley come and stand behind Davis as he performed his job, Shaw said: "Yes.  And I seen him stand behind me, too." Shaw added: "He's always standing behind me, but that's – that's me.  I give him a hard time all the time."

The episode cited in the October 22, 1998 letter in which "Kurt" (or "Kirk"), a white man, allegedly left the plant without permission and was not punished has been addressed above in connection with the issue of a dual system of discipline.  The Court has concluded that the evidence does not support a finding that the Kurt incident was sufficiently similar to any incident involving a black worker to enable a factfinder to determine that there was racially disparate discipline.  For the same reason, it does not support a finding of hostile work environment.  There

-34-

are no other specific incidents described in the letter.

Davis' affidavit says NVG management did not investigate the complaints made against Sculley in the October 22, 1998 letter.  Davis does not explain how he knows this.  Quinn's affidavit states that "then-Employment Supervisor Billy Owens reviewed the allegations with Mr. Sculley and, to my recollection, found no problems or basis for corrective action.  Mr. Owens is African-American and has since retired."

Davis avers that the discriminatory treatment described in the October 22, 1998 letter was condoned by Area Manager Rick Slowik.  When asked at his deposition the basis for this allegation, Davis testified only that, as far as he knew, Slowik did not make any attempt to find out whether the allegations in the letter were true.  However, there is no evidence that it was Slowick's responsibility as area manager to conduct an investigation; rather, as Quinn states, NVG's investigation was conducted by then-Employment Supervisor Billy Owens.

In response to Davis' claim of harassment by Sculley, Quinn points out that Davis was written up on various occasions by other supervisors who had responsibility for him.  Attached to Quinn's affidavit are disciplinary writeups from supervisors Tom Dickinson, John Sabene, and Jesse Hall.  Hall is a black man.  Davis does not deny being disciplined by these supervisors.

Davis also says in the second amended complaint that after his return to work from the Wicks suspension, he began to experience racially motivated treatment from white coworkers. Davis says he "was hit by [a] component part thrown, had cigarette smoke blown into face, etc." Davis adds that Sculley condoned such conduct and did not discipline the coworkers.

In this respect, Quinn's affidavit states:

> Davis alleges that when he returned to work he was hit by a part and had cigarette smoke blown in his face. I investigated the smoke complaint in

-35-

conjunction with UAW Civil Rights Committee member Herman Vaughn. Mr. Vaughn is African American.  I note that Mr. Vaughn specifically stated that Davis "did not have a case" and that he (Vaughn) "did not see anything racist involved."  There was never any evidence presented to suggest who, if anyone, allegedly threw the part, nor did Davis identify any witnesses to this event.

(Paragraph number and reference to record omitted.)

Davis testified in his deposition that the part that hit him was made of hard rubber and measured about one by two inches.  He did not know who threw it.  His belief that the thrower intended to hit him and was motivated by racism is pure speculation.

As for the smoke incident, Sculley's affidavit states:

Davis returned to work in April, 1999 after serving a 33 day suspension. Within a month of his return he complained that a co-worker, Ken Nelipowitz, was smoking on the line and that the smoke was bothering him. I directed Nelipowitz to stop smoking. He complied and did stop for a while. However, a short time later I was made aware that he was smoking again and that Davis had called Nelipowitz a racist. After discussing the situation with the parties, in the presence of a union representative I moved a non-smoking individual to the job near Davis and moved Nelipowitz to a job where he could smoke and not bother Davis. I am not aware of any additional action Davis expected under these circumstances.  There was no policy banning smoking in the plant at this time.

There is no basis to find that NVG's handling of Davis' complaints about smoke was improper or reflected racial discrimination.

To summarize on the issue of a racially hostile work environment, Davis relies principally on the following: racist graffiti, epithets, and nooses; being hit by a part thrown by someone; having smoke blown in his face; racially disparate discipline; and Sculley's alleged conduct in monitoring blacks more closely than whites.  In considering this evidence, the Court is aware as noted above that, because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff may rely in part on instances of hostility which were not directed at him

-36-

and, in some circumstances, on incidents occurring when he was not present.  This does not mean, however, that a plaintiff may rely on unsubstantiated rumor and hearsay to resist summary judgment, nor does it allow him to rely on conclusory statements.

Here, the Court has reviewed in detail the evidence presented by Davis.  With respect to racist graffiti, epithets, and nooses, accepting plaintiff's version of the few occurrences as to which there is competent evidence, no reasonable factfinder could view them as amounting to more than a few isolated incidents of racial enmity.  There is no basis to find that NVG's handling of Davis' "blown smoke" complaint or the "thrown part" incident was improper, nor is there a basis to find that either of these incidents bore any relationship to Davis' race.

Further, the Court has discussed in detail the allegations of racially disparate discipline, and has found that no reasonable factfinder could conclude that NVG's discipline of Davis for the Wicks incident, or any other incident, was racially discriminatory.  Moreover, viewed in the light most favorable to Davis, the evidence would not permit a reasonable factfinder to conclude that NVG's discipline of him and other employees reflected a dual system of discipline based on race. To the contrary, Davis relies primarily on unsubstantiated and/or conclusory allegations and a few random anecdotes about incidents that have not been shown to be comparable.  Nor does the statistical evidence relied on by plaintiffs support a finding that NVG administered discipline in a racially discriminatory manner.  Thus, Davis' allegations of racially disparate discipline do not support his claim of hostile work environment.

Finally, the Court considers the allegations that Sculley monitored black workers more closely than white workers.  Much of this evidence is non-specific and conclusory.  The October 22, 1998 letter, signed by Davis, Shaw, and Hamilton is unsworn.  The evidence that arguably

tends to support a hostile work environment claim includes Davis' opinion that Sculley watched the line from the center because the black workers were clustered there, Hamilton's anecdote regarding his return from the bathroom, Hamilton's statements to the effect that Sculley watched him and Davis and not Brian Peyat, a "white guy," and Hawkin's observations that there was "a lot of focus" on Davis and that once a "tall skinny" supervisor followed Davis to the bathroom. There is no evidence regarding the frequency of the alleged occurrences or the time period during which they occurred.  Accepting for the purposes of this motion the truth of the allegations relied on by Davis in this regard, and viewing them in the light most favorable to Davis, they do not demonstrate that Sculley engaged in race-based scrutiny of the black workers under his supervision that was severe, continuous, concerted, humiliating, threatening, or that otherwise contributes substantially to a showing of an objectively hostile work environment..

In conclusion, the majority of Davis' hostile workplace allegations are general and conclusory; most of the specific incidents either concern isolated offensive utterances or bear no apparent relationship to race; with respect to those incidents bearing no apparent relationship to race, there is no basis to infer that they were motivated by racial bias; none of the incidents alleged is severe; the alleged conduct is not continuous and concerted; and no reasonable factfinder could conclude that the incidents would be physically threatening or significantly humiliating to an objective person or would unreasonably interfere with his work.  Viewing all the evidence in the light most favorable to Davis, and considering the totality of the circumstances, the Court finds that NVG has established that no objective person would perceive Davis' workplace to be permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment.  Further viewing all the evidence in a

light most favorable to Davis, and considering the totality of the circumstances, the Court finds that he has failed to adduce evidence raising a question of fact on this issue.  As such, Davis has failed to adduce evidence sufficient to withstand summary judgment dismissing his hostile workplace claim.

**Retaliation**

To make out a *prima facie* case of retaliation, a plaintiff must show that he was engaged in protected activity known to the employer, that he suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).  To satisfy the "protected activity" element, the plaintiff need have had a good faith, reasonable belief that he was opposing a prohibited employment practice.  *See Kessler v. Westchester Co. Dept. of Social Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).  Disruptive  or unreasonable protests against discrimination are not protected activities and therefore cannot support a retaliation claim.  *See Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000).  A close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse actions can establish the required causal link for a *prima facie* case.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See id.* at 721.  If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.  *See id.*

-39-

Davis alleges that as a result of the protected activity of writing the October 22, 1998 letter, he was subjected to retaliatory reprimands and discipline.  He alleges that Rick Slowik, area manager, called Davis into his office and accused him of creating a hostile work environment.  In his affidavit, Davis states with respect to this meeting: "Mr. Slowik condoned and ratified the conduct of supervisor Sculley, and threatened me with termination on or about November 30, 1998, weeks after I had submitted a complaint on or about October 22, l998, for racial discrimination against Mr. Sculley."  The record contains a memo from Davis to Slowick, dated November 30, 1999:

> Per our meeting this morning, I am writing to recap your comments to me, and to respond to the statements and issues that you raised.
>
> In the meeting you made several statements including – (i) You (Alfonso) are creating a hostile work environment which is destroying morale; (ii) if this behavior continues you will find yourself on the outside looking in; (iii) You have created friction between workers and union representatives or workers and management; and (iv) I would get rid of you in a heartbeat.
>
> At the meeting, I made one comment. It was you need to be able to substantiate that and make sure that you have all the facts. What are the facts? It is a fact that before the shift begins I encourage my fellow workers that we can reach 600 during the night. It is a fact that I commit myself to working at high quality and practicing what I preach (i.e. working to make our goal number). It is not uncommon for me and Paul to work through breaks to fill up the line (i.e. doing my job, the drop job, and the chain job, and Paul doing his job, the input and the stud job). I believe the real facts paint a picture very different from your comments.
>
> In my opinion, you are attempting to shift responsibility for line morale to me. It is the responsibility of the line foreman to increase and maintain morale. I am left to wonder if the comments that you made to me are a response to the issue raised by myself and other African-Americans concerning our perception of Scully's disparate treatment.

In his Memorandum of Law, Davis states that he "interpreted Mr. Slowik's verbal reprimand and threat as retaliation for his written complaint against Mr. Sculley."  Davis adds that

he "made Mr. Slowik's supervisor aware of the issue as well as the union" and that "[w]ithin 90 days of Mr. Slowik's threat, Mr. Davis was terminated."

Davis does not appear to argue that the November 30, 1998 meeting itself was an adverse employment action taken in retaliation for the October 22, 1998 letter.  Nor would such an argument have merit; the November 30, 1998 meeting in itself had no material effect on his employment conditions.  The Court has already held (in the context of Davis' claim of racially discriminatory discipline) that defendants have established a legitimate, nondiscriminatory reason for his suspension after the Wicks incident; thus, there is a non-retaliatory ground for the suspension.  Further, the Court has already held that Davis has failed to demonstrate that the reason given for his suspension was a pretext and that the real reason was racial discrimination.

In support of his claim that the real reason for his suspension was retaliation for the October 22, 1998 letter, Davis argues that an improper retaliatory motive may be inferred from the "temporal proximity" between the letter and the suspension.  However, more than four months elapsed between the two events.  Courts have held that plaintiffs relying solely on temporal proximity to show causation must demonstrate a "very close connection" in time between the protected activity and the alleged retaliation.  *See, e.g., Carter v. New York*, 310 F.Supp.2d 468, 478, n.5 (N.D.N.Y.  2004), *aff'd* 151 Fed. Appx. 40 (2d Cir. 2005) (four months was too long to establish a causal connection between the protected activity and the alleged retaliation, citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Here, viewing the record evidence in the light most favorable to Davis, there is no evidence of retaliatory motive, and the period of more than four months is too long to support a finding of causation in the absence of other evidence.  There is no evidence of a causal connection

-41-

between the protected activity and the adverse employment action.  Accordingly, NVG is entitled to summary judgment dismissing this claim.

**State law claims**

Discrimination claims under New York's Human Rights Law are evaluated by the same standard as Title VII and section 1981 claims.  Thus, Davis's state law discrimination claims are dismissed for the same reasons as his federal claims, discussed above.

In the Memorandum of Law on his behalf, Davis does not oppose dismissal of his claims for intentional and negligent infliction of emotional distress.  Thus, they are deemed abandoned and dismissed.  In any event, they lack merit and are barred by New York's Workers' Compensation Law.

**Conclusion – NVG's motion**

Finally, to the extent the second amended complaint may be read to state a claim on behalf of Davis against NVG for breach of the collective bargaining agreement, it lacks merit for the reasons set forth above.  Moreover, having been pled for the first time in the second amended complaint, it is time-barred.  *See McKee v. Transco Prods., Inc.*, 874 F.2d 83, 86 (2d Cir. 1989).  NVG's motion insofar as it seeks summary judgment dismissing Davis' claims against it is granted in its entirety.

**The union's motion**

In plaintiffs' second amended complaint, the allegations against the union regarding plaintiff Davis are as follows:

> On March 4, 1999 ...I was confronted by a part-time White employee, Jason Wicks.  Following the incident, Plaintiff Davis learned that in the intervening period between the confrontation with Wicks and my being walked out of the plant, union representative, Carl Osborne, offered direct

-42-

union consultation to Wicks.

Mr. Osborne not only conferred with Wicks, but failed to provide Plaintiff Davis with any  assistance even though he (Davis) was a member of Defendants International UAW and UAW Local 624 in good standing.

Plaintiff Davis overheard union representative demand of my supervisor, Mike Scully, and Area Manager, Rick Slowik, "to get me the fuck off the line, and the fuck out of the plant."

Plaintiff was very concerned and angry that a union representative paid to represent members would refuse, and in fact, advocate for my termination. Plaintiff Davis conveyed his distress in writing to Mike Allen, President of UAW Local 624.

In a letter dated June 17, 1999, [from] Gary Dattmore, Recording Secretary of UAW Local 624, Plaintiff Davis was informed that the union's investigation of his allegations of racism were unfounded because of a lack of evidence.

Prior to Plaintiff receiving letter dated June 17, 1999, he was told during a conversation with President Allen that he (Allen) did not believe that union representative Osborne's actions were unbecoming a union member. Allen stated that he believed that crossing a picket line was unbecoming a union member, but did not believe that my lack of representation, and Osborne's demand that management terminate me rose to the level of misconduct.

Plaintiff Davis is keenly aware that under the contract he was to be represented rather than Wicks, and that he did not receive that representation, and attributes such failure to his race and color rather than the situation.

(Paragraph numbering omitted.)  Although the second amended complaint is not clear, the Court assumes that Davis intends to assert race discrimination claims against the union under Title VII (42 U.S.C. §§ 2000e-2(c)), section 1981, and New York's Human Rights Law, as well as a claim for breach of the duty of fair representation under 29 U.S.C. § 185 and state law (breach of contract).

In order to establish a race discrimination claim against a union concerning its

-43-

representation of a member's interests, the plaintiff must show that the union breached its duty of fair representation and that it did so on the basis of the member's race.  *See Nweke v. Prudential Ins. Co. of America*, 25 F.Supp.2d 203, 220 (S.D.N.Y. 1998).  The duty of fair representation requires a union to represent all members of its bargaining unit honestly and in good faith, without hostility, discrimination, or arbitrary conduct.  *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967).  A union has considerable discretion in dealing with grievance matters, *see Ayala v. Union de Tronguistas de P.R., Local 901*, 74 F.3d 344, 345-46 (1st Cir.1996); thus, "the duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance."  *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1153-54 (2d Cir.1994).  To make out a claim of discriminatory breach of duty of fair representation, the plaintiff must further show that the union's actions were motivated by discriminatory animus.  *See generally Lee v. ITT Standard and United Steelworkers Local 897*, 268 F.Supp.2d 315, 336 (W.D.N.Y. 2002); *Nweke*, 25 F.Supp.2d at 221..

In support of its motion for summary judgment as to Davis, the union relies principally on the affidavits of Michael Allen, president of defendant Local 624 at the times in question; Harry S. Stanton, vice president of Local 624 at the times in question; and Herman Vaughn, co-chair of the Local 624 Civil Rights Committee at the times in question.  Based on first-hand knowledge, these affidavits demonstrate that following the Wicks/Davis incident on March 3, 1999, NVG suspended Davis on March 4, 1999, and that on March 8, 1999, NVG changed Davis' suspension to discharge.  Local 624 grieved the discharge.  Allen's affidavit explains the union grievance procedure.  Allen assigned Stanton to investigate the Wicks incident, and Stanton's affidavit

-44-

describes the investigation he conducted.  Local 624 processed the grievance through the second step of the grievance procedure.  At this step, NVG returned Davis to work on April 7, 1999, converting the discharge to a 33-day unpaid suspension.  Allen states that upon obtaining Davis' return to work, Local 624 withdrew the grievance, because "it did not appear that Local 624 would obtain a better outcome by further processing the grievance[.]"  Davis did not appeal the withdrawal of the grievance as he was entitled to do under the union constitution.

At Allen's request, Stanton investigated Davis' allegation that Carl Osborne, alternate union steward, had sided with Wicks and promoted Davis' discharge, thus engaging in conduct unbecoming a union member.  Stanton's affidavit describes the investigation.  He concluded that Osborne had not attempted to have Davis suspended.  Local 624's Civil Rights Committee also investigated Davis' claims that Wicks had used a racial epithet and that Osborne had urged NVG to suspend Davis.  Vaughn, who is black, describes the Civil Rights Committee's investigation.  No evidence of racial discrimination was found.  Davis appealed to UAW International Union, which rejected the appeal as untimely.

The union has shown, based on admissible evidence, that it had legitimate nondiscriminatory grounds for its actions and that its actions were not motivated by discriminatory animus.  Viewing the evidence in a light most favorable to Davis, the Court finds that the union has demonstrated its entitlement to summary judgment, thus shifting the burden to Davis to show by competent evidence that material questions of fact exist requiring a trial.

In opposition to the union's motion, Davis' Statement of Material Facts, opposing affidavit, and Memorandum of Law reiterate Davis' contention that Wicks used a racial slur and that NVG's handling of the Wicks incident was racially discriminatory.  The Court has already

-45-

rejected Davis' claim that NVG treated him in a racially discriminatory manner.  There is no other ground upon which a reasonable factfinder could conclude that NVG breached the collective bargaining agreement with respect to the Davis/Wicks incident.  On this record, the union's exercise of discretion in concluding (after obtaining Davis' return to work) that it would not obtain a better outcome by further processing the grievance cannot reasonably be found to be arbitrary, irrational, or subject to a claim of bad faith.

Moreover, Davis has not shown that the union's conduct was motivated by discriminatory animus.  He relies on his deposition testimony that shortly after the Wicks incident he heard Osborne, the alternate union steward, "yelling, get him the fuck out of the ...off the line and the fuck out of this plant, and then I'm sick of this fucking nigger."  Davis did not mention that Osborne used the word "nigger" (or any other racial epithet) in the second amended complaint.  In their reply affidavits, Allen and Osborne state that Davis did not mention the epithet in his charges against Osborne to Local 624.  Indeed, there is no evidence that Davis ever raised the question of the racial epithet until he was deposed in this action.

The papers generated as part of Local 624's investigation show that Beverly Carter, a coworker, stated that shortly after the Wicks altercation she had read Osborne's lips when he was using the telephone in the supervisor's office, and that she saw his lips form the word, "nigger."  Carter testified to similar effect in her deposition.  Allen opined that the office was 60 or 70 feet from where Carter worked; in her deposition Carter said it was about 30 feet away.  That the union did not view Carter's averment as credible is not evidence that the union was motivated by racial discrimination.  Davis further makes the conclusory statement in the Memorandum of Law on this motion that Osborne "conferred with Mr. Wicks to concoct a 'story' that would produce

-46-

discipline for Mr. Davis." Davis' support for this allegation is his deposition testimony that he saw Osborne walking back and forth and talking to Wicks and other white workers. Apart from these allegations, Davis relies on hearsay, speculation, and conclusory allegations in support of his contention that Osborne harbored racial animus against him and did not represent him fairly.

Likewise, to the extent that Davis' other averments against the union are relevant to the claims before the Court, they are almost entirely made up of hearsay, speculation, and conclusory statements.[10]  Even accepting as true those relevant factual allegations advanced by Davis that are supported by competent firsthand evidence, and viewing them in the light most favorable to Davis, the Court finds that he has failed to adduce competent evidence upon which a reasonable factfinder could conclude that the union's exercise of its discretion in refusing to file grievances against NVG on his behalf was arbitrary, irrational, or subject to a claim of bad faith, or that it was motivated by racial animus.  To the extent that any of Davis' other state law claims may be construed as being asserted against the union, they lack merit.  Accordingly, the union is entitled to summary judgment dismissing Davis' claims.

### PLAINTIFF CHERI MARTIN-WEATHERLY

**Second amended complaint**

Plaintiff Cheri Martin-Weatherly, who was hired by NVG in 1992, makes the following allegations in the second amended complaint with respect to NVG:

In 1997, Plaintiff Martin-Weatherly was transferred to Department 862.

---

[10]

For example, Davis characterizes as "shabby" the union's Civil Rights Committee investigation of the allegations against Sculley made by Davis and others in the October 22, 1998 letter.  Davis' affidavit states: "The investigation by the union through its Civil Rights Committee was shabby and incomplete. Many workers were not spoken to, or if spoken to, were put off for a later time that never came."

Not long after the transfer, Plaintiff Martin-Weatherly, began to be harassed by co-worker, Danny Fiore.

Plaintiff believes that Fiore primarily targeted her for offensive epithets, comments and physical threats of violence because of her race and gender.

On or about January 22, 1999, Plaintiff Martin-Weatherly attended a physical therapy appointment, and was away from the department during morning hours. When Plaintiff Martin-Weatherly returned to work, she was informed by several co-workers that Mr. Fiore was furious with her.

Plaintiff Martin-Weatherly approached Fiore in hopes to soothe the situation and let him know that it was management that had failed to adequately provide cover in her absence. When Plaintiff Martin-Weatherly attempted to explain this fact, Fiore became hostile and belligerent, and began to use abusive language.

Fiore continued his tirade and threatened Plantiff Martin-Weatherly by saying, "Sooner or later I am going to get you, just wait and see, real soon."

Plaintiff Martin-Weatherly ... perceived this as a physical threat, and was particularly frightened because Fiore shortly thereafter made physical contact with Rosalind Hicks, who is also African-American and female, repeatedly while carrying an eight (8) pound main shaft as a weapon.

Fiore engaged in daily and ongoing harassment including, sitting near Plaintiff Martin-Weatherly's job station, giving her constant and intimidating stares, and pacing the floor in her direct view. Plaintiff Martin-Weatherly informed the supervisor, Liz McLaughlin of the ongoing problems.

Supervisor McLaughlin said that she would talk to Fiore and there would be an investigation. It appeared to Plaintiff Martin-Weatherly that after she reported it, Fiore became more abusive.

On several occasions, Plaintiff Martin-Weatherly pointed out to her supervisor that Fiore had increased his harassment and that he made it a point to visit her work station more frequently.

Plaintiff Martin-Weatherly asked supervisor McLaughlin about the alleged investigation into Fiore's threats and overall behavior, as it appeared to Plaintiff that nothing [was] being done, and Fiore's behavior was being allowed with impunity.

-48-

Supervisor McLaughlin told Plaintiff Martin-Weatherly that she could not get involved with her problems, and directed her to contact the head of plant security, John Keller.

Plaintiff reported the incident(s) to John Keller, but he told her that he did not have time because he was too busy with the State of the Plant meetings. Despite this, Plaintiff Martin-Weatherly notified various management officials including Mark Spasato, Billy Owens, Jerry Mallory, and Anthony Scarlata.

On another occasion, after Fiore returned from attending a Communications Workshop, he mocked the training, and stated that he hated being in the class with those "chicks and bitches." Fiore made his comments inclusive of both Plaintiff Martin-Weatherly and the other women in the department as well.

Fiore's harassment of Plaintiff Martin-Weatherly continued as he threatened her, and began to follow her around.

On or about January 29, 1999, Plaintiff Martin-Weatherly and co-worker Rosalind Hicks went to John Keller, Plant Security Head, to add the incident involving Hicks to the record and to make him aware that Fiore's behavior had continued.

No corrective action was taken, and Plaintiff Martin-Weatherly was further subjected to Fiore's behavior as it continued unchecked through the spring and summer 1999. For example, on or about July 12, 1999, Plaintiff Martin-Weatherly returned to work from a family funeral. A new temporary supervisor, Bob Franklin, was on duty.

Fiore took advantage of supervisor, Bob Franklin, convincing him to tell Plaintiff Martin-Weatherly she was fired just to get a reaction.

Upon information and belief, on or about August 16, 1999, Fiore pulled truck driver Ron off his fork lift in anger. Upon information and belief, Fiore was not disciplined for this action.

Plaintiff Martin-Weatherly notified management that Fiore's behavior was escalating in violence, and that he was now more dangerous. Nothing was done to stop Fiore's behavior.

Plaintiff Martin-Weatherly found that her complaints were not seriously addressed, and notified management of the difference she saw in the discipline given to African American workers and White workers.

-49-

Plaintiff Martin-Weatherly is aware of altercations and confrontations involving similarly situated non-Black employees where little or no discipline is given. In contrast, African American employees similarly situated have been severely disciplined and/or terminated.

When Plaintiff Martin-Weatherly brought the racial bias to management's attention she received no response. Plaintiff is convinced that had her harasser been African American he would have been severely disciplined or terminated.

Fiore has remained on the job, and continued to call women, including Plaintiff Martin-Weatherly, offensive names and to subject her to harassment that has gone unchecked.

On or about August 31, 2000, Plaintiff spoke with John Keller, head of plant security, and Andrew Quinn, Employee Relations, concerning her ongoing complaints of racial bias and discrimination including the "hanging noose" incident, and racists hand tattoos wore by White employees.

Quinn told Plaintiff that Defendants New Venture Gear and DairnlerChrysler were satisfied with what had been done in each of the incidents, and that nothing else would be done.  When Plaintiff attempted to ascertain exactly what had been done she was rebuffed.

The next day, Plaintiff was told that she would be removed from light duty and returned to regular duty. Plaintiff was approximately 6 1/2 months pregnant and had been placed on light duty due to her pregnancy.

Plaintiff believes Defendant New Venture Gear and Daimler Chrysler attempted to return her to regular duty in retaliation for her inquiry about the ongoing incidents of racial discrimination.

Plaintiff Martin-Weatherly is currently out on leave of absence for work-related stress which has caused pregnancy complications[.]

Defendants New Venture Gear and DaimlerChrysler had refused to pay Plaintiff for her work-related leave, and when she called to ascertain whether compensation forms had been processed, was told by management official that he had "forgotten" to do so.

Plaintiff has been out a few months and perceives Defendants New Venture Gear and DaimlerChrysler's denial as financial retaliation against her. As a

-50-

result, she has experienced nosebleeds after speaking with Defendants' compensation officials.

(Paragraph numbering omitted.)  She asserts causes of action against NVG for hostile workplace (racial and sexual harassment) and retaliation under Title VII, section 1981, and New York's Human Rights Law.  As against the union she asserts causes of action for racial discrimination under section 1981 and Title VII, as well as breach of contract and breach of the duty of fair representation.  She also asserts claims against NVG and the union under New York's common law for assault, intentional infliction of emotional distress, and negligent infliction of emotional distress.

**NVG's motion, generally**

In support of its motion for summary judgment dismissing Martin-Weatherly's claims against it, NVG relies on the affidavit of Andrew J. Quinn, Human Resources Coordinator and Labor Relations Representative at NVG during the times in question.  Quinn explains NVG's policy prohibiting discrimination or harassment, its manner of administering discipline, and its Standards of Conduct; the Court has summarized Quinn's affidavit above in connection with Davis' claims.  NVG also submits affidavits and relies on deposition testimony from various supervisors and coworkers having first-hand knowledge of the incidents in issue.  These, along with Martin-Weatherly's responses, are discussed below where relevant.

**Hostile work environment**

The elements of a hostile work environment claim are set forth above in the discussion of Davis' claims.  In evaluating the evidence, the Court considers the totality of the circumstances.  As with any summary judgment motion, the Court views the evidence in the light most favorable to the non-movant.

-51-

In moving for summary judgment dismissing Martin-Weatherly's claim of hostile work environment based on race and/or sex, NVG argues that "[t]he facts alleged in the second amended complaint are conclusory in nature, and discovery in this case failed to produce any substantive, material allegations ... sufficient to warrant a trial."  NVG points out that the second amended complaint refers to only three specific incidents involving Fiore and Martin-Weatherly: the January 22, 1999 confrontation with Fiore, the July 1999 incident in which Fiore persuaded a new supervisor to tell Martin-Weatherly that she was fired, and the incident when, after a communications class, Fiore referred to women as "chicks" and "bitches."  Martin-Weatherly also refers to two incidents involving Fiore and coworkers: an incident on August 16, 1999, in which Fiore allegedly pulled another worker off his truck in anger, and an incident on January 22, 1999, in which Fiore allegedly repeatedly bumped into Roselind Butler (also referred to as Roselind Hicks), a black coworker.  NVG also responds to Martin-Weatherly's other hostile workplace allegations, which include allegations of disparate discipline.

In opposition to NVG's motion, Martin-Weatherly relies primarily on her deposition testimony and affidavit, as well as portions of the depositions of Butler and John Keller, NVG's Director of Security.  Martin-Weatherly's affidavit states in all pertinent parts:

> While working under area manager Mark Sposato and supervisor, Liz McLaughlin, I was discriminated against due to my sex and race, and endured a hostile work environment. At the time I was harassed by Mr. Fiore, I was one of two females employees in the department.  The other female was Roselind Hicks whose married name is Butler.
>
> I was harassed by Mr. Fiore over a significant period of time. Mr. Fiore's harassing behavior began before the January 22, 1999, threat he made to me.
>
> The threat Mr. Fiore made to me threatened physical harm. He told me to "I'm going to get you, wait and see." When Mr. Fiore made the threat I had

just returned from a physical therapy appointment. He assumed as usual that the line being down was due to me.

Others told me that Mr. Fiore was upset, and as I approached my work area, I knew that I was going to have to deal with him. As he waited at my work station, I prepared myself to just tell him the facts. He began using foul language and berating me for causing him to lose money.

I told Mr. Fiore that I was not responsible for the assembly line being down. Management had failed to have someone cover my job. But that didn't matter to him. He was bent on reducing me to size, and continued his tirade. I was forced to listen to him because he was at my job operation. I had little choice.

Finally, I told him that I was not his problem, and he should take responsibility for himself.  I never used profanity. I just reminded him that he needed to act better to insure his own financial security. I never spoke to him the way he was speaking to me.

In response, Mr. Fiore threatened me. I took his threat seriously. He had physical altercations with males in the department, and I felt that soon I could be next. I made an immediate complaint to management and the union. The supervisor spoke with him, and a union official, but he wasn't disciplined in any way.

The way Mr. Fiore stalked me and stared at me was really scary.  Often I would catch him just looking at me. He would stare so intensely it was frightening. He made me feel very vulnerable. I could feel his eyes all the time.

On a regular and constant basis, Mr. Fiore would leave his job position and come to my job position. My job was near the front of the line, and quite a distance from his operation. So he didn't inadvertently end up at my job, it was intentional.

Once at my job, Mr. Fiore would stare at me, and then manically laugh. His behavior was frightening and scary. I didn't know what he would do from minute to minute, and it kept me on edge.

Other times Mr. Fiore approached me he would yell and scream. He often walked towards my work area and used the term "bitch." Because I was the only operator on my job function, I believed he was referring to me.  I found the term offensive.

-53-

I have heard him called Supervisor McLaughlin "bitch" to her face. She would do nothing. He was allowed to speak anyway he wanted, and he was not disciplined for it.

When Mr. Fiore wasn't using the term "bitch" he would refer to women as chicks. I found this language derogatory, and believed that he felt that women were less than men.

I never attempted to coerce union official, Denny Demore, into saying that New Venture Gear plant was a "white man's world." Rather, Mr. Demore made this comment to me when I mentioned to him that Mr. Fiore was a time bomb waiting to happen. I explained that I would defend myself if attacked by Mr. Fiore. Mr. Demore told me that if I attempt to defend myself, I would be fired. I could not understand how a victim could be disciplined for protecting herself. He then agreed that this could happen because the New Venture Gear plant was a "White man's world."

I was aware of the racial tension at the plant. I knew that African Americans were treated differently. But, I had not personally encountered the demeaning power of the term "nigger" until Marybeth informed me of the significance of her tattoo.

I had not solicited the information. I had not noticed the tattoo. I had not asked her about its meaning. Marybeth without warning displayed her tattoo, and informed me that it meant "I hate niggers." Given her drunkenness, I felt that she was being so uninhibited because she was voicing what she really felt.

The fact that she decided to share the meaning with me made me feel singled out. No longer was the hostile racial environment at the plant something that could be explained away as an anonymously crude joke. It was alive and breathing. There were people in the plant who hated me not because I had done something to them, but because of the color of my skin.

Marybeth's tattoo and the message it represented scared me. I wondered who else carried insignias of racial hatred on their bodies. I am forever changed in a fundamental way.
***
The fact that Mr. Fiore was allowed to harass and terrorize me is directly related to Mr. Andy Quinn['s] failure to discipline Mr. Fiore. He chose to follow the recommendation of my direct supervisory staff and left me vulnerable. Mr. Quinn is a key player in disciplinary decisions at New Venture Gear plant, and I believe played a role in the discipline given to Plaintiffs Smith, Piquet, and Davis.

-54-

> While I was not disciplined during the time of these complaints, I was affected by the disparate discipline policy of New Venture Gear. Mr. Fiore was not disciplined because I was a Black victim.
>
> The disparate discipline policy affects African Americans in both ways. Caucasian perpetrators who violate the standards of conduct will not be addressed in the same manner as their Black counterparts; and Black victims would be disciplined along with their perpetrators.

(Paragraph numbering omitted.)

*Hostile workplace based on race*

Martin-Weatherly's allegations regarding Fiore's conduct and NVG's response thereto are discussed below in connection with Martin-Weatherly's claim of hostile workplace based on gender.  Accepted as true and viewed in the light most favorable to Martin-Weatherly, the allegations regarding Fiore provide no support for a claim of hostile workplace based on race.

With respect to her claim of a racially hostile workplace, Martin-Weatherly refers in the Memorandum of Law to "racial bias and discrimination including the 'hanging noose' incident, and racist hand tattoos worn by White employees."  As discussed above in connection with Davis' claims, coworker Zachary Oliver testified to a single incident involving a noose occurring in April 2000.[11]  NVG relies on Quinn's affidavit to establish that it thoroughly investigated the incident, that it found no evidence that anyone had intended to display the rope as an actual noose or that it was directed towards any individual or group, and that representatives of the UAW

---

[11] Martin-Weatherly does not claim that she saw the noose.  Nevertheless, evidence that an employer tolerated the presence of nooses in the workplace would be relevant on the question of the overall hostility of the workplace.  As the Second Circuit notes: "Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

International Union investigated and concluded that NVG had handled the situation appropriately and no further action was required.

As for the "racist hand tattoos worn by White employees[,]" there is evidence of only one tattoo worn by one white employee, Marybeth Craw.  By all accounts, including Martin-Weatherly's, the tattoo was a cross with three dots above it and thus was not overtly racist.  Craw told Martin-Weatherly that the tattoo meant "I hate niggers."  Quinn's affidavit explains that the incident was investigated by Keller, who found no support for the tattoo's allegedly racist meaning.[12]  Indeed, Martin-Weatherly testified: "[H]ad [Marybeth] not told me about [the racist significance] I would have no knowledge of it."  Essentially, this incident concerns a single statement by one coworker ascribing a racist meaning to a tattoo that did not appear to have anything to do with race.  The Court notes also that at her deposition, Martin-Weatherly acknowledged that she herself had never directly been called a "nigger" by anyone at NVG.

In further support of her claim of a racially hostile workplace, Martin-Weatherly makes

---

[12]

Keller explains in his affidavit:

> Martin-Weatherly also came to see me to complain about a tattoo on one of her co-workers that Martin-Weatherly believed was racially offensive.  Martin-Weatherly alleged that the co-worker named Marybeth had told her the tattoo (a cross with three dots over it) meant "I hate niggers".  I also investigated this allegation and interviewed Marybeth who told me that she had gotten the tattoo when she was in high school and believed at the time that it had something to do with joining a Mexican gang. She later was told by someone that the tattoo meant "I hate niggers" but that it did not mean that to her. She told me that she specifically told Martin-Weatherly that she did not hate African Americans. I told Marybeth irrespective of what she understood the meaning of the tattoo to be, she should not repeat that type of language and that she should not flaunt the tattoo in any means that would otherwise make her co-workers uncomfortable. I also personally called every tattoo parlor in the phone book to try to determine if there was any objective basis for the racist meaning ascribed to the tattoo and I found none. The most common answer I got was that the three dots above the cross referred to the Christian trilogy of the father, son and holy ghost.

some general allegations about racially disparate discipline of other workers at NVG.  The Court has already reviewed Davis' extensive allegations of racially disparate discipline, including the report by Dr. Schwager, and has found that they do not support a finding that NVG engaged in racially disparate discipline.

With respect to racially disparate discipline, Martin-Weatherly refers to an incident on August 16, 1999, in which Fiore allegedly pulled a truck driver off his forklift in anger.  Sposato states that Fiore was not involved in that incident.  Martin-Weatherly in her deposition states that she reported this incident to the union and to McLaughlin, but no disciplinary action was taken.  Even accepting that this event occurred as Martin-Weatherly alleges, there is insufficient evidence regarding this or other allegedly comparable incidents to support an inference of hostile workplace based on disparate discipline.

In her deposition, Martin-Weatherly also reports various rumors and other hearsay evidence allegedly showing disparate discipline based on race, but despite the extensive discovery conducted in this case, she presents no competent evidence in this regard.[13]   There is no evidence that Fiore's intimidating conduct was directed more towards blacks than whites – indeed, Butler states that it was not – nor does the evidence support a finding that Martin-Weatherly was subjected to this conduct because she was black.  Viewing the evidence in a light most favorable to her, and viewing the circumstances in their totality, the Court finds that Martin-Weatherly has

_____

[13] For example, Martin-Weatherly also refers to the incident in which Ron Reid and Guy Lamacchia had an altercation.  Martin-Weatherly was not present when it occurred.  This incident is discussed above in connection with Davis' claim that NVG's handling of the Wicks incident was racially discriminatory.  Due to the absence of competent evidence of any comparable incident, NVG's handling of the Reid-Lamacchia altercation does not support a finding of racially disparate discipline or racial discrimination of any kind.

failed to adduce evidence that the workplace was permeated with racially discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment.  Thus, she has failed to adduce sufficient evidence of hostile workplace racial harassment to resist summary judgment.

_Hostile workplace based on gender – generally_

With respect to Martin-Weatherly's confrontation with Fiore on January 22, 1999, NVG relies on the affidavits of Quinn, John Keller (Director of Corporate Security) and Mark Sposato (Martin-Weatherly's area manager at the time), describing their investigation of the incident. Quinn states that "the investigation revealed that Martin-Weatherly had initiated an argument with Mr. Fiore upon hearing that he had been critical of her work effort."  Sposato explains that Martin-Weatherly's absence for physical therapy caused the assembly line to shut down and, because the employees on that line were paid on a group incentive basis, they all lost pay due to her absence.  According to Sposato, Fiore, who worked on the same line as Martin-Weatherly, "had a reputation for wanting to maximize product generated by the line and, accordingly, his earnings."  Sposato adds that Fiore had raised objections about other workers who were not working up to speed or were otherwise "holding up the line[.]" Sposato states that five days after the incident, Martin-Weatherly complained to him that Fiore was using foul and inappropriate language directed towards her and Butler.  Sposato investigated the matter and found insufficient support for Martin-Weatherly's complaint of harassment.  Sposato explains: "The incident, if it occurred as alleged [by Martin-Weatherly], was one employee giving another a hard time about her work effort, but Fiore's use of inappropriate language would nevertheless have violated NVG's policies.  I therefore warned Mr. Fiore that harassment of any kind is unacceptable and

-58-

would subject him to discharge from employment."  Sposato also directed McLaughlin, who was Fiore's and Martin-Weatherly's immediate supervisor, to monitor the situation and report to him any incidents of foul or abusive language.  Sposato received no subsequent complaints about Fiore from Martin-Weatherly, and McLaughlin did not report any further problems between the two.  Sposato adds that he is not aware of any other complaints against Fiore that might be viewed as racial and/or sexual harassment.

McLaughlin, who was not present in the plant on January 22, 1999, says in her affidavit that she heard of the incidents and asked Martin-Weatherly about them on the following day. According to McLaughlin, Martin-Weatherly told her that Fiore said "you are affecting my livelihood" and "you'll get yours."   McLaughlin's affidavit states:

> Fiore was a fast worker who was keenly interested in achieving high rates of production and producing quality parts. He had trouble with employees who were slow or produced poor quality. At times, he would complain about these employees and he would report quality problems. However, I am not aware of any physical altercation between Fiore and another employee.

Martin-Weatherly says she also reported the incident to Keller, NVG's director of security. According to Keller's affidavit, Martin-Weatherly complained to him "generally" "about Mr. Fiore's harassing demeanor."  Keller adds: "I never understood her to be complaining about sexual harassment, based on her gender, nor do I believe she ever used those terms."  Keller says that NVG concluded, after investigating Martin-Weatherly's complaints, that Fiore "was loud to various employees" and that there was no evidence that he singled out Martin-Weatherly based on her race or gender.

On January 22, 1999, the same day as Fiore's altercation with Martin-Weatherly, the incident occurred in which Fiore bumped into Roselind Butler.  Butler, who was a "floater" and

would ordinarily have filled in when Martin-Weatherly was at physical therapy, also had a

physical therapy appointment; as a result the assembly line was shut down.  Martin-Weatherly

testified that she did not witness the bumping incident.  Butler testified:

> Q. Can you tell me what happened?
> A. That day he was upset because Ms. Weatherly and I had appointments
> with the physical therapist and apparently the line had been down and
> when we got back, like I said, he was crazy, he was pacing up and down
> the aisle and he was using all kinds of language. I went back to my station
> where I was working, which was building hubs, Ms. Weatherly went to her
> job –
> Q. What was your station?
> A. Building hubs. Ms. Weatherly went to her station, I guess, because at
> that point I was in the middle of the line and her job was up at the top of
> the line.
> Q. Okay.
> A. And the next thing I know he was up front somewhere.
> Q. Mr. Fiore?
> A. Fiore, yup, at the front on the line where Ms. Weatherly's job is, up in
> that area. When he came from the front of line he went back to his job
> which was – I don't know the name of his job, which was close to where I
> was working.
> Q. Okay.
> A. As he went to grab the main shaft and the hub together, because you
> have to hold the part together, he was still enraged, he kept walking by me
> bumping into me. And at first I thought that he was so upset that he didn't
> realize what he was doing, so when he, you know, kept doing it then when
> I asked him I said, you do know that you're bumping me and he had the
> hub and the main shaft in his hand and he was like, oh, yeah, if I was really
> trying to bump you you would know it, and I was, like, well, oh, yeah, then
> how will I know that, he said, because you would be on the F-ing floor, and
> then one thing led to another.
> Q. What do you mean when you say one thing led to another?
> A. Well, we exchanged words, we ended up having to get a union steward
> down there.
> ***
> Q. Can you describe for me the bumping in terms of where he bumped you
> and how he bumped you?
> A. When he come walking past I was – so he just kept bumping into this
> side of my arm (indicating). Remember, I was building hubs, so by him
> bumping me, it was keeping me from building the hubs because he kept –
> my arm kept jerking.

-60-

Butler testified that her supervisor, Liz McLaughlin, knew about the incident.

Butler also testified that there were "plenty of times" when she and Martin-Weatherly had

problems with Fiore.  She stated:

> Either something we did wrong or we [weren't] doing it right or we weren't
> doing it fast enough, he would totally flip.
> ***
> He would stand over you if you weren't fast enough, he would watch you
> get ready for work, if you were a few minutes late, he basically did the
> supervisor's job but worse[.]

She stated that he was "scary" because "he would be so upset, and there was nobody there to help

you[.]"  She also stated that he used foul language – "F this" – but she did not allege that he used

racial epithets.  She further testified as follows:

> Q. Was he like that to both white and African American employees?
> A. I would say yes, he was like that, that was him.
> Q. Okay.  Was he like that to male employees as well as female
> employees?
> A. I think mainly female.
> Q. Did you ever see him act that way toward a male employee?
> A.  I never saw him no.
> ***
> Q. Did you ever get the impression he had any other purpose of motivation
> in harassing co-workers other than trying to make more money?
> A. No.
> Q. Do you have any other personal knowledge of any facts or
> circumstances that you think would support a claim by Ms. Martin-
> Weatherly that anyone harassed her or discriminated against her because of
> her race or her sex?
> A. No.

In testimony similar to Butler's description of Fiore's "standing over" her and watching

her get ready for work, Martin-Weatherly alleges that Fiore "stalked" her, "stared" at her, and

"followed" her, particularly after the January 22, 1999 incident.  In describing how he "followed"

her, she explains: "If I left my job, he was there.  If I went in another area, he was there. If I came

back to my job, he was there."  The lack of specificity regarding the frequency of these alleged

incidents makes them difficult to evaluate.  For example, in her deposition, Martin-Weatherly said

they occurred more than once, but when asked whether they occurred more than five times, she

stated: "I can't pinpoint exactly."  She added that it was "Too many times.  Enough to make me

uncomfortable."  Likewise, Butler's testimony is not specific as to frequency or duration.

There is no evidence of any sexual component to this conduct; the evidence offered by

Martin-Weatherly and Butler in this regard consistently characterizes Fiore's conduct as

motivated by the desire to make more money.  Martin-Weatherly further testified that she never

believed that Fiore had a romantic interest in her and that he "never physically violated [her] or

harassed [her] or anything like that[.]"  And she states in her affidavit that at the time of the

January 22, 1999 incident, she was aware that he had had physical altercations with males in the

department.

McLaughlin's affidavit states in this regard:

> It is my understanding that Martin-Weatherly alleges in this lawsuit that
> Fiore sexually harassed her by stalking her, watching her and calling
> women "bitches" in her presence. Martin-Weatherly did complain to me of
> Fiore being around her too much on January 26, 1999. On that particular
> day, the assembly line was down and employees were walking around in
> the department. I did not observe any inappropriate conduct by Fiore, but I
> told Martin-Weatherly that I would tell Fiore to stay in his own area. I then
> gave Fiore that directive. Martin-Weatherly never characterized Fiore's
> actions to me as "stalking" nor did she complain of "sexual harassment" by
> Fiore. I do not believe Martin-Weatherly made any other complaint to me
> about Fiore being around her too much.  I am not aware that Fiore called
> me a "bitch."

Martin-Weatherly alleges that Fiore called women offensive names.  In her affidavit, she

relates one particular incident on January 26, 1999 in which Fiore referred to women in a

communications workshop he had attended as "chicks and bitches."  She also states in her

-62-

affidavit that he used the word "bitch" while walking toward her work area and while speaking to

their supervisor McLaughlin.  In her deposition, she states generally that he used these words

frequently.  Questioned at her deposition regarding whether Fiore had ever called her a chick,

Martin-Weatherly stated:

> I believe he has.  He made reference to everyone as chicks and bitches.
> But if I was in a close proximity of him and he was using the word chicks
> or bitch, how am I to know that he's not referring to me.  He said it loud
> enough for me to hear, he's talking to someone – you know, when someone
> is glaring at you, I feel that I'm being referred to as that chick or that bitch.

In her deposition, Martin-Weatherly further testified:

> Q. Your notebook doesn't say anything about bitches, does it?
> A. Not there, but he refers to women as chicks and bitches. He's repeatedly
> called Liz McLaughlin bitches.
> Q. I understand. But you weren't there for that, you heard about that?
> A. Excuse me. I'm in the department with Danny all the time, I hear him
> call her a bitch, I hear him call women bitches. It may not have been here.
> In general he refers to women as chicks and bitches.
> Q. Well, I asked you before about Mr. Fiore's comment and this was in the
> context of the – what we referred to as the GM incident. I think you told
> me you didn't hear the comment about Ms. McLaughlin?
> A. You're correct on that day. This is a common practice of Danny Fiore
> throughout the day.
> Q. Is there some other reference in your notebook where he referred to
> women as bitches?
> A. I really don't know.
> Q. Would you agree that that would be an important notation to make if it
> happened?
> A. Not necessarily. That is what he did all the time. This is something that
> he does every day. If, in fact, I noted him calling women a bitch every day
> it would probably be on every date in my book.

Butler, too, testified that Fiore used the word "bitch" around supervisor Liz McLaughlin.

Asked whether she had heard him do so, Butler testified that "if it was something he was told to

do ... he was big on what's not in his job description and he was quick to say that bitch this or I

don't have to do [that] – so yes, I've heard him."  Counsel asked: "When you heard him say ...

-63-

this bitch this, this bitch that, whatever he said, did you understand him to be referring to his supervisor?"  Butler responded: "Yes, because that's who he would be talking to."

Martin-Weatherly does not articulate the frequency or duration of Fiore's allegedly offensive conduct after January 1999.  She states, rather, that she "was further subjected to Fiore's behavior as it continued unchecked through the spring and summer 1999."  The only other specific example, given, however is the July 12, 1999, incident in which at Fiore's suggestion, Bob Franklin, a temporary supervisor, told Martin-Weatherly that she was fired.  Sposato's affidavit explains that Franklin himself reported the incident to Sposato.  Martin-Weatherly's deposition testimony was that Franklin said to her: "Danny Fiore said I should fire you and when you see him tell him I did."  Sposato stated that Martin-Weatherly did not file a formal complaint about the incident with him, or, as far as he knows, with anyone else at NVG.  This incident in itself has no gender-related element.

*Hostile work environment based on gender – analysis*

Overall, the evidence from all witnesses, including Martin-Weatherly, is that Fiore was a coworker who became upset when the assembly line was slowed or stopped.  According to Sposato's uncontradicted declaration, Fiore "had a reputation for wanting to maximize product generated by the line and, accordingly, his earnings[,]" and had raised objections about other workers who were not working up to speed or were otherwise holding up the line.  Likewise, Fiore's supervisor, McLauglin, stated that Fiore was "a fast worker who was keenly interested in achieving high rates of production and producing quality parts[,]" that he "had trouble with employees who were slow or produced poor quality[,]" and that at times, "he would complain about these employees and he would report quality problems."  Referring to the January 22, 1999

-64-

incident, Martin-Weatherly's affidavit states: "When Mr. Fiore made the threat I had just returned from a physical therapy appointment. He assumed as usual that the line being down was due to me.... He began using foul language and berating me for causing him to lose money.... I told Mr. Fiore that I was not responsible for the assembly line being down. Management had failed to have someone cover my job."

The competent record evidence from Martin-Weatherly, Butler, and others, viewed in the light most favorable to Martin-Weatherly, establishes that Fiore's conduct on January 22, 1999 (in particular his altercation with and threat to Martin-Weatherly and the incident in which he repeatedly bumped into Butler) had no overt sexual element. To the contrary, the evidence is undisputed that he was angry because Martin-Weatherly's and Butler's absence had held up the line, causing him to lose money. Although they were the only two women on the line, there is nevertheless no basis to conclude that Fiore's conduct during this incident was directed at Martin-Weatherly and Butler because they were women. Rather, the evidence is that they were the two people he believed to be responsible for causing the assembly line to be shut down for a significant period of time.

On the same ground, there is no evidence that Fiore's alleged conduct in staring at and following Martin-Weatherly was gender-related. Martin-Weatherly stated that she had no reason to believe that Fiore had a "romantic" interest in her. The only evidence regarding his possible motive for following and staring at Martin-Weatherly is that he was concerned with her work speed and/or quality. As Butler put it, "[h]e would stand over you if you weren't fast enough, he would watch you get ready for work, if you were a few minutes late[.]" Nor, apart from conclusory statements that it "continued" and was "frequent," is there evidence of the frequency

-65-

or duration of Fiore's conduct in watching or otherwise harassing Martin-Weatherly after the January 22, 1999 incident.

In addition, Martin-Weatherly's allegations about Fiore's physical altercations with male coworkers during the same time period militate against drawing an inference that his intimidating conduct towards her was motivated by the fact that she was a woman. And there is no basis to infer that Fiore's conduct in suggesting that Franklin pretend to fire Martin-Weatherly was motivated by gender bias.

Viewing the evidence in its totality, and in a light most favorable to Martin-Weatherly, the Court concludes as a matter of law that Fiore's alleged harassment of Martin-Weatherly was not sufficiently severe or pervasive to meet the threshold for a hostile work environment, nor has Martin-Weatherly shown that it related to her gender. There is insufficient evidence to enable a finder of fact to determine that Fiore's allegedly harassing conduct, such as watching Martin-Weatherly, was more that episodic. Further, Martin-Weatherly alleges no physical touching, no overt sexual advances, and a single threat ("I'll get you") which Martin-Weatherly did not interpret as referring to sexual activity. Nor, as noted, is there evidence that Fiore's conduct towards Martin-Weatherly was motivated by her gender rather than by his opinion about her work performance. As such, Martin-Weatherly's claim that the conduct of which she complains was related to her gender rests principally on evidence that Fiore used the terms "bitch" and "chick" in the workplace, although she does not allege any specific incident when such words were directed towards her, nor does she spell out the period of time during which this occurred. Viewed in the totality of the circumstances, including the nature of the workplace, her evidence that these words were used in her presence, even if frequently, by one coworker with no authority over her is

insufficient to support a finding that she was subjected to treatment that was sufficiently severe, threatening, or humiliating, or that would otherwise rise to the level of an objectively hostile or abusive work environment permeated with gender-related discriminatory intimidation.  Nor has she presented evidence upon which a finder of fact could conclude that the other incidents of which she complains, which are not overtly gender-related, were in fact related to her gender.

In considering whether there is other support for Martin-Weatherly's claims, the Court is aware that evidence of harassment directed at others in the workplace can be relevant to an employee's own hostile work environment claim.  However, this does not excuse a plaintiff from adducing competent evidence regarding the alleged harassment of others.  In her deposition Martin-Weatherly reports various rumors and hearsay anecdotes allegedly showing discriminatory treatment of other employees based on gender, but despite the extensive discovery conducted in this case, she presents no competent evidence in this regard.  In the context of discussing Davis' claims, the Court has rejected the report from Dr. Schwager relied on by plaintiffs as demonstrating disparate discipline at NVG based on race and/or gender.  And there is no evidence that Butler's problems with Fiore were motivated by gender bias.  As such, Martin-Weatherly's claim of a hostile workplace based on sex is not supported by these allegations.

Further, while there is some authority permitting a plaintiff to aggregate evidence of racial and sexual harassment to support a hostile work environment claim where neither charge could survive on its own, *see generally Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572, n.7 (2d Cir. 2000), such an exercise would not benefit Martin-Weatherly.  The evidence adduced by Martin-Weatherly of both racial and sexual harassment, viewed in its totality, would not enable a reasonable jury to conclude that the conduct complained of was sufficiently severe or pervasive to

-67-

alter the conditions of her employment based on her race and/or her gender.  Accordingly, summary judgment is granted dismissing Martin-Weatherly's claims against NVG based on a hostile work environment.

**Retaliation**

The Court has set forth the requirements of a retaliation claim above, in connection with Davis' claim.  The facts as alleged by Martin-Weatherly with respect to her claim of retaliation are as follows. In the second amended complaint, Martin-Weatherly alleges that on August 31, 2000, she "spoke with John Keller, head of plant security, and Andrew Quinn, Employee Relations, concerning her ongoing complaints of racial bias and discrimination including the 'hanging noose' incident, and racists hand tattoos wor[n] by White employees."  Quinn responded that NVG "was satisfied with what had been done in each of the incidents, and that nothing else would be done."  According to the second amended complaint, when Martin-Weatherly "attempted to ascertain exactly what had been done she was rebuffed."  The next day, John Hayes, a manager, told Martin-Weatherly was told that NVG was eliminating all light-duty jobs and that she would be removed from light duty and returned to regular duty.  Martin-Weatherly states that she "was approximately 6½ months pregnant and had been placed on light duty due to her pregnancy."  Martin-Weatherly says she believed that this was an isolated change and that other employees were permitted to continue in light duty positions.  She claims NVG "attempted to return her to regular duty in retaliation for her inquiry about the ongoing incidents of racial discrimination."  On September 1, 2000, she went out on disability due to pre-term labor allegedly caused by work-related stress.  On September 4, 2000, she was notified that her position had not been eliminated and that she could return to light duty work.  Nevertheless, she remained

-68-

out on disability and was still out as of the date of the complaint, 13 months later.

Quinn states in his affidavit that Martin-Weatherly did approach him and Keller "to inquire about the status of other investigations not directly related to her." He does not recall her making any specific requests or complaints at the time. He states her light duty position was not discontinued because of her conversation with him and Keller, and she did not receive any disciplinary action at any time relevant to the proceedings. Quinn adds that it is his understanding "that Martin-Weatherly alleges she was told by Manager John Hayes that all light duty positions were being eliminated at that time. That may very well be true."

Quinn's reply affidavit states:

> I understand that Plaintiff Martin-Weatherly alleges that she was told by John Hayes that her light duty position was being eliminated after a meeting she had with John Keller and me on August 31, 2000. I at no time told Mr. Hayes of this conversation with Martin-Weatherly, and have no reason to believe he would even be aware of this conversation. I had no knowledge of any elimination of light duty jobs at that time, nor would I have expected Mr. Hayes to have informed me of this. I have no reason to believe that the job eliminations had anything to do with the subjects discussed with Martin-Weatherly that day. Given the size of the plant and the number of employees, it is highly unlikely that a decision to eliminate jobs could have been made and announced to Martin-Weatherly on the same day, even if Mr. Hayes had been made aware of the discussion. As indicated in my earlier affidavit, Mr. Hayes is African-American.

In considering whether Martin-Weatherly has made out the elements of a *prima facie* case of retaliation, the Court observes that it is doubtful whether Martin-Weatherly's discussion with Quinn and Keller on August 31, 2000 rises to the level of a protected activity. Assuming that it does, the elimination of her light duty position could arguably constitute an adverse employment action, *see generally Kessler*, 461 F.3d at 207-08, although there is little evidence on the differences between her light duty position and the position she would otherwise occupy. And the

temporal proximity of the two events is sufficient to make out a *prima facie* showing of causation.

However, even assuming *arguendo* that Martin-Weatherly has made out a *prima facie* case, her retaliation claims must still fail.  Martin-Weatherly has not shown that anyone actually responsible for eliminating the position was aware of her conversation with Quinn and Keller. She has not offered any evidence contrary to Quinn's statement that he did not tell Hayes of the conversation and had no reason to believe Hayes was aware of it.  Further, she has not shown that Quinn or Keller had the authority to influence the elimination of her position, let alone that they actually did so.  Thus, Martin-Weatherly has not raised a question of fact in the face of NVG's proof of lack of causal connection, and she offers no evidence from which a reasonable jury could infer a causal connection between her discussion with Quinn and Keller and the elimination of her light duty position.  NVG's motion for summary judgment insofar as it seeks dismissal of Martin-Weatherly's retaliation claim is granted.

**State law claims**

New York's Human Rights Law discrimination claims are evaluated by the same standard as Title VII and section 1981 claims.  Thus, Martin-Weatherly's state law discrimination claims against NVG are dismissed for the same reasons as her federal claims, discussed above.

In the Memorandum of Law on her behalf, Martin-Weatherly does not oppose dismissal of her claim for negligent infliction of emotional distress.  Thus, it is deemed abandoned and dismissed.  In any event it would be barred by the exclusivity provision of New York's Worker's Compensation Law, §§ 11, 29(6).  *See Lawson v. Electronic Data Sys., Inc.*, 584 N.Y.S.2d 359, (4th Dept.. 1992).

Nor does she oppose dismissal of her claim for assault.  It is deemed abandoned and

-70-

dismissed.  The Court notes that the claim is based on her allegations of sexual harassment by

Fiore, which lack merit.  Further, this claim, asserted for the first time when she was added as a

plaintiff by the amended complaint filed November 17, 2000 (Dkt. No. 4), is time-barred under

N.Y.C.P.L.R. 215(3).  Moreover, her allegations do not support a finding that the claim falls

within an exception to the exclusivity provision of New York's Workers' Compensation Law.

Martin-Weatherly opposes dismissal of her claim for intentional infliction of emotional

distress.  In her Memorandum of Law, she bases this claim solely on the conduct of John Hayes, a

manager, in revoking her light duty status in August 1999.  Presumably this is because claims

based on other alleged incidents would be time-barred.  *See Misek-Falkoff v. Int'l Bus.*

*Mach.iness Machines Corp.*, 556 N.Y.S.2d 331 (1ˢᵗ Dep't 1990) (one year statute of limitations

applies to causes of action for intentional infliction of emotional distress).  Neither the second

amended complaint nor the record evidence would support an intentional infliction of emotional

distress claim based on Hayes's conduct; they do not describe any conduct in connection with this

(or any other) incident that was so extreme and outrageous as to exceed all bounds of decency or

to be utterly intolerable in civilized society.  *See Fischer v. Maloney*, 43 NY2d 553, 557 (1978).

Summary judgment is granted dismissing this claim as well.

**Conclusion – NVG's motion**

Finally, to the extent the second amended complaint may be read to state a claim on behalf

of Martin-Weatherly against NVG for breach of the collective bargaining agreement, it lacks

merit for the reasons set forth above.  Moreover, having been pled for the first time in the second

amended complaint, it is time-barred.  *See McKee v. Transco Prods., Inc.*, 874 F.2d 83, 86 (2d

Cir. 1989).  NVG's motion insofar as it seeks summary judgment dismissing Martin-Weatherly's

claims against it is granted in its entirety.

**The union's motion**

Although the second amended complaint is not clear, the Court assumes that Martin-Weatherly intends to assert race and sex discrimination claims against the union under Title VII (42 U.S.C. §§ 2000e-2(c)), section 1981, and New York's Human Rights Law, as well as a claim for breach of the duty of fair representation under 29 U.S.C. § 185 and state law (breach of contract).  As set forth above in connection with Davis's discrimination claim against the union, Martin-Weatherly must show (1) that the union breached its duty of fair representation, that is, it failed to represent her honestly and in good faith, without hostility, discrimination, or arbitrary conduct, and (2) that the union's actions were motivated by discriminatory animus.

Martin-Weatherly claims that the union refused to file grievances on her discrimination complaints against NVG and that this refusal was discriminatory.  The Court has already rejected Martin-Weatherly's claim that NVG treated her in a discriminatory manner.  There is no other ground upon which a reasonable factfinder could conclude that NVG breached the collective bargaining agreement with respect to Martin-Weatherly.  On this record, the union's exercise of its discretion in refusing to file grievances against NVG on her behalf cannot reasonably be found to be arbitrary, irrational, or subject to a claim of bad faith.

Moreover, Martin-Weatherly has made no showing that the union's conduct was motivated by discriminatory animus.  Martin-Weatherly avers she made numerous complaints to union officials concerning Fiore's conduct and sought union intervention in the situation through the filing of a grievance, which the union refused to pursue.  She states she was repeatedly told that the union could not get involved in a hostile work environment complaint, although she was

-72-

aware that the union had filed harassment grievances on behalf of white union members.  She

testified in her deposition that the union had filed sexual harassment grievances on behalf of two

white female union members, Billy Cerio and Vicky.  Her evidence does not, however, show that

her problems with Fiore were in any manner similar to the situations involving the other two

women.

Regarding Fiore, the union submits the affidavit of James T. Serens, a former union

steward at Local 624, stating that in January 1999 he received a complaint from Martin-

Weatherly that Fiore was harassing her.  Serens told her she should report it to her supervisor and

explained that it was not within his power as a union steward to resolve personality disputes

between bargaining unit employees.  Serens did speak to Fiore, who complained that

Martin-Weatherly's frequent absences from the assembly line caused him to lose money.

The union also relies on the affidavit of Michael Allen, president of defendant Local 624

at the times in question.  After learning of Martin-Weatherly's complaint that Fiore was harassing

her, Allen "discussed this matter with the Plant Shop Chair Mike Kozlowski, and [they] decided

to have the Local 624 Civil Rights Committee investigate the matter."  Attached to his affidavit is

the report dated May 12, 1999, by Tommy Neal and Herman Vaughn, the chair and co-chair of

the Civil Rights Committee.  The report states:

> After a thorough investigation, on May 12, 1999, of Sister Cheri
> Martin-Weatherly's allegations of discrimination, we found no evidence to
> support that the company or Brother Danny Fiori violated Sister
> Martin-Weatherly's civil rights based on race, creed, religion, ethnic
> background, gender, nationality, or physical handicap.
>
> Brother Danny Fiori treated all workers that he worked with the same,
> yelling at them to not hold up the line, etc. Management warned him that
> he could face disciplinary actions if he didn't control his actions.
> Management also sent him to a communication class since this incident

occurred. Since then, he has been in control of his emotional outbursts. An
apology, extended by Brother Danny Fiori to Sister Cheri
Martin-Weatherly, promoted the resolution of this situation between the
two of them.

Allen adds: "In light of their findings, no further action was taken by Local 624."

In an affidavit, Vaughn explains the investigation in greater detail.  He interviewed

Martin-Weatherly, Fiore, and six or seven other employees who worked nearby, and concluded

that Fiore was "loud and abrasive towards his co-workers" and yelled at others when he thought

they were not working fast enough or were otherwise slowing down production on the line.

Vaughn found "no evidence that Fiore's obnoxious behavior was directed at anyone on the basis

of race, color, gender, or other improper factor."

Further, union steward Denny Demore submits an affidavit stating:

> [I]n the Summer of 1999, Plaintiff Martin-Weatherly spoke to me about
> Danny Fiore, another employee who worked in department 862. She
> wanted him removed from the department because he was harassing her
> and talking about her to other people in the department. She did not claim
> that he was making racial remarks.  I told Ms. Martin-Weatherly that, as a
> union steward, I did not have the authority to remove an employee from the
> department and that if Fiore was bothering her she should report it to her
> supervisor.

Martin-Weatherly submits no competent evidence refuting the union's account of its investigation

of her complaint and the grounds for its refusal to pursue a grievance on this issue.

With respect to Martin-Weatherly's allegation that union officials did not respond to her

complaints about the incident involving Marybeth Craw's tattoo, Allen's reply affidavit states that

alternate steward Mike Antonacci handled the matter; that Allen spoke to several African-

Americans, none of whom was aware of a racial meaning to the tattoo; and that Allen was aware

that NVG's investigation had produced the same result. Allen concludes: "Given this lack of

-74-

objective evidence, Local 624 did not take any further action with regard to Craw's tattoo."
Again, Martin-Weatherly submits no competent evidence refuting the union's account of its
investigation of her complaint and the grounds for its refusal to pursue a grievance on this issue.

Demore also addresses Martin-Weatherly's allegations in her Statement of Material Facts
that the union took no action in response to statements made in the presence of Demore and
Martin-Weatherly by a coworker, John Courcy, Jr., that women do not belong in the workplace.
Demore states that he responded immediately when Courcy made the statement, that he later told
Courcy he should stop making such remarks or he would be disciplined, and that he further
reported the incident to Martin-Weatherly's supervisor Patrick D. Case and told Case to make
sure Courcy stayed away from Martin-Weatherly.  According to Demore, Martin-Weatherly did
not request a grievance, nor was there a contract violation to protest.  Case submits an affidavit
stating that he met with Courcy and Courcy's union representative, Mike Antonacci, and told
Courcy that if he continued to make such statements "it would result in serious consequences up
to and including discharge from employment."  Case adds that Martin-Weatherly did not
complain to him about Courcy thereafter. With respect to this and other allegations by Martin-
Weatherly (such as her complaint that the union did not properly represent her in connection with
charges by a coworker, Lorraine Courcy, that Martin-Weatherly had assaulted her), it appears that
Martin-Weatherly disagreed with the union's manner of handling the matters; however, there is
no support for a finding that the union acted in a discriminatory manner.

Accepting as true those relevant factual allegations advanced by Martin-Weatherly that
are supported by competent firsthand evidence, and viewing them in the light most favorable to
her, the Court finds that she has failed to show by competent evidence that material questions of

-75-

fact exist requiring a trial.  To the extent that any of Martin-Weatherly's state law claims may be construed as being asserted against the union, they lack merit.  Accordingly, the union is entitled to summary judgment dismissing Martin-Weatherly's claims.

## PLAINTIFF LOUIS B. EUDELL, II

**Second amended complaint**

Plaintiff Louis B. Eudell, II was hired by NVG in 1994.  In the second amended complaint, he states that he is bi-racial and makes the following allegations against NVG:

> Throughout the course of Plaintiff Eudell's employment, he spoke out repeatedly against  injustices committed against himself and other racial minority co-workers.

> Plaintiff Eudell reported several incidents of racial discrimination perpetrated by his supervisors to Defendant New Venture Gear and DairnlerChrysler management officials which resulted in acts of retaliation against him.

> In February 1999, Plaintiff Eudell returned to work following a leave of absence for work-related stress and anxiety. On or about February 24, 1999, Plaintiff Eudell was summoned to Owen McGraw's office, Employee Relations Manager, who advised the plaintiff to "watch his back" because of his lifestyle while out on leave.

> Plaintiff Eudell believes that comparably situated White employees do not face such attacks on their credibility when returning to work following absences based on work related mental or emotional disabilities.

> On or about February 27, 1999, Plaintiff Eudell reported for overtime at the New Venture Gear plant. He noticed that the machine he was to operate displayed a flashing alarm on the screen which indicates that there is a malfunction.

> Mr. Eudell notified interim supervisor, Dick Kazeraski, who sent job set-up worker, Richie Briant, Sr., to check the machine. Briant claimed nothing was wrong with the machine, but was unable to get the alarm to desist.

> Plaintiff Eudell remained cautious of the machine, and requested an "AVO" from supervisor, Kazeraski. In this instance, an "AVO" is a written

authorization from a supervisor assuming responsibility for the quality of parts produced, and/or any other ramifications that happen as a result of operating a machine in such condition.

Mr. Kazeraski refused, and Plaintiff Eudell requested that a union steward be dispatched to deal with the situation. Kazeraski made threats to fire plaintiff if he did not operate the machine.

Plaintiff reluctantly proceeded to operate the malfunctioning machine while waiting for his union representative to arrive.

At hire, Plaintiff Eudell was informed during orientation that when a machine malfunctions, an operator should not "run" it until has been repaired, and/or without an AVO from the supervisor. Plaintiff followed company procedure and contractual protocol when he informed the supervisor and requested an AVO, as well as, ask that a union steward be dispatched.

A significant period of time pas[sed], and still the union steward never showed up. Plaintiff Eudell was nervous about running the machine due to the alarm, and threats by the supervisor to fire him if he did not run the machine. Plaintiff was caught in a "catch-22" and felt forced to continue to run the machine until the union steward arrived, and he could file a grievance.

Plaintiff Eudell notified his supervisor a second time concerning the machine, and made a second request for an "AVO." Kazeraski refused a second time, and shouted, "fuck it, just shut it down (referring to the machine)." Plaintiff Eudell moved away from the machine, and stopped working on that machine.

Kazeraski was called to another department or otherwise left the area, and Bob Bagley assumed supervision. Once Bagley found out Plaintiff Eudell wanted an "AVO" he came over to him. Plaintiff Eudell explained the situation with the machine, and in response, Bagley yelled, "run this fucking job or you will be fired."

Again, Plaintiff Eudell requested an "AVO," and informed Bagley if he was going to operate the machine, then an union steward needed to be dispatched.

The machine was again worked on, and not fully repaired until lunch break. Plaintiff Eudell left for lunch.

Upon Plaintiff Eudell's return from lunch he was approached by supervisor Bagley. Plaintiff Eudell proceeded to operate the machine, and was prevented by Bagley.

At this point, supervisor Bagley began screaming at Plaintiff Eudell saying, 'You think you're a smart mother fucker, don't you? You think you are hot shit. You think because you come in here with your hot shot clothes and your Mercedes Benz, that you are smart.. . Just give me by the weekend and I'm going to have your fucking job." Plaintiff Eudell, responded, by telling Bagley, "do what you have to, Bob."

About one hour later, Plaintiff Eudell was approached by Kevin Kinne, the assigned union steward. Kinne informed Plaintiff Eudell that supervisor Bagley wanted to suspend him for insubordination.

Plaintiff Eudell asked Kinne how could he be suspended for insubordination when he had run nearly 84 pieces on the malfunctioning machine as he waited, and he had followed company procedure and contractual protocol in requesting both an AVO and dispatch of a steward. Despite plaintiffs protests he was summarily suspended.

Plaintiff Eudell is aware that other similarly situated non-Black employees were not subjected to such discipline for making requests for AVOs' or requesting dispatch of their union steward.

Eudell is convinced that Bagley's actions were motivated by racial prejudice and retaliation because plaintiff had previously charged Joe Zulo, Bagley's friend and co-supervisor, with comparable allegations of racism in the workplace.

On prior occasions, Plaintiff Eudell witnessed racial propaganda being posted on a bulletin board. The discriminatory material was not removed immediately; and coupled with the on-going racial jokes told by co-workers, Wes and Mark Murray (both of whom had no fear of being reprimanded as management would be present and laugh at the jokes), created an harassing and racially hostile work environment.

In one instance, Plaintiff Eudell was instructed by a co-worker, Wes, to a complete a job.  Plaintiff Eudell declined as Wes was not a supervisor and was not authorized to mete out job assignments. In addition, Wes had made his distaste of Blacks no secret including placing a confederate flag on his toolbox as an insignia of his beliefs.

Plaintiff Eudell was approached by supervisor, Chris Kowalski, who asked

him why he had not done as Wes had told him. Plaintiff Eudell explained that (i) Wes was not a supervisor, and therefore could not give "out" assignments, (ii) that he was well aware of how Wes felt about him and other Blacks, and (iii) that Wes' confederate flag was offensive.

In response, Kowalski told Plaintiff Eudell, "that's your problem not mine, and any time Wes tells you to do something it is a direct order from me."

Such response lead Plaintiff Eudell to believe that Wes' racially offensive behavior was condoned, and that he (Wes) had been given "card blanche" to perpetrate further racially offensive conduct against him including daily surveillance of parts produced, and of his leave and return to and from breaks.

Plaintiff Eudell resigned effective June 1, 1999, from Defendants New Venture Gear and DaimlerChrysler due to the overwhelming racial discrimination meted against him, and the stress and anxiety it caused.

(Paragraph numbering omitted.)  Eudell claims that he was subjected to a hostile work environment due to racial harassment and a dual system of discipline.  He also claims that NVG retaliated against him in various respects.

**NVG's motion**

In support of its motion for summary judgment dismissing Eudell's claims against it, NVG relies on the affidavit of Andrew J. Quinn, Human Resources Coordinator and Labor Relations Representative at NVG during the times in question.  Quinn explains NVG's policy prohibiting discrimination or harassment, its manner of administering discipline, and its Standards of Conduct; the Court has summarized Quinn's affidavit above in connection with Davis' claims.

NVG also relies on evidence from Quinn that during the course of his employment, Eudell received ten disciplinary actions for attendance-related problems, including chronic absenteeism, leaving work early, and absence from this workstation. He received nine disciplinary actions for poor quality workmanship. He received disciplinary layoffs, without pay, for insubordination (ten

-79-

day suspension), absence from his workstation (two day suspension), and chronic absenteeism (five day suspension).  Attached to Quinn's affidavit are sixteen disciplinary notices issued by a number of supervisors and area managers concerning various incidents.

Quinn specifically addresses the incident on February 27, 1999.  Quinn states that Eudell refused to run his machine as instructed after repeated directives to do so by supervisors Robert Bagley and Richard Kostoroski.  Attached to Quinn's affidavit are Bagley's and Kostoroski's memos as well as Quinn's report concerning the incident. After reviewing this situation with the union, NVG agreed that a ten day suspension was an appropriate response to Eudell's misconduct against the background of his poor work record.

Quinn further states that Eudell did not complain to him or, to his knowledge, any NVG management representative regarding racial discrimination against himself or on behalf of others. When Eudell resigned, he told Quinn he was taking a job with another employer.

NVG also relies on an affidavit from supervisor Owen McGraw explaining the situation in which he advised Eudell to "watch his back" because of his activities while out on disability leave.  According to McGraw, due to confidentiality policies, he did not know the nature of Eudell's disability leave.  McGraw states that, after hearing that Eudell was observed playing basketball during his disability leave, McGraw "gave a friendly warning to Eudell that he needed to be mindful of his activities while out on disability leave and that things he did outside the plant could potentially catch up to him inside the plant."

In opposition to NVG's summary judgment motion, Eudell submits his own affidavit prepared in response to the motion.  His response to defendants' Statement of Material Facts cites almost exclusively to this affidavit; the only other citations are to the disciplinary records attached

to Quinn's affidavit, the collective bargaining agreement, and Eudell's Memorandum of Law.

The allegations in the affidavit are discussed below.

**Hostile work environment**

*Evidence*

The elements of a hostile work environment claim are set forth above in the discussion of

Davis' claims.  In evaluating the evidence, the Court considers the totality of the circumstances.

As with any summary judgment motion, the Court views the evidence in the light most favorable

to the non-movant.  NVG argues that, viewed in the light most favorable to Eudell, the record

evidence establishes that he was not subjected to a racially hostile work environment.

In his affidavit in opposition to summary judgment, Eudell states:

> Not long after commencing employment with NVG (in 1994), I began to
> be harassed on account of my race by White co-workers.
>
> The harassment included insults to the car I drove, to the clothes I wore,
> racial epithets, racial jokes, use of racist symbols, rude and offensive
> language, threats by a co-worker to put a bullet through my eyes from five
> hundred yards away, and disparate treatment.
>
> I complained to NVG management ... but to no avail.

Eudell relates a number of instances in which coworkers teased him about having a Geo

Prism vehicle, including a time period in 1994 when some referred to him as "Geo Bob."

Apparently in response to NVG's view that the teasing occurred because Eudell was driving a

foreign car during a time when "Buy American" sentiments were strong, Eudell opines that "the

continual references to Geo Bob by ... co-workers, all of whom were White, had to be about me as

a Black man in the department because the Geo was manufactured at a General Motors/Toyota

plant in Fremont, California. It was not a foreign car."  Eudell does not allege that coworkers

-81-

made any explicitly racist comments about his car or clothing.

Eudell's affidavit relates an incident on October 19, 1994, in which he had problems with a machine and notified Skip Forderkonz, the machine setup man.  According to Eudell, Forderkonz "approached the machine and exclaimed loudly that the problem was my fault. He began yelling, 'you're fucking up the machine racks if you run it this way.'"  Forderkonz allegedly continued this tirade in the presence of a supervisor, who ultimately "had to physically restrain Skip to prevent him from physically attacking [Eudell]."  Eudell's affidavit states:

> Other than telling me to shut up for daring to talk back to Skip which was, of course, precipitated by his unjustified provocation, Supervisor Nieroda took no action against Skip – it seemed that he believed that I, as a Black man, was uppity. The harassment and physical actions were not further investigated by the company.

Eudell also claims that on January 15, 1995, after finishing his assigned tasks before the end of the shift, he had showered and changed into a suit, and that upon seeing him, Forderkonz became visibly angry and made comments such as "who do you think you are, coming in here with your hot shot clothes?"  Although Eudell complained, NVG took no action.

According to Eudell, about two months later, his toolbox was vandalized.  Eudell states: "I suspected that the attack was racially motivated and in retaliation for my complaints, as nothing was stolen from the toolbox, it was just vandalized."  Although he reported the vandalism, NVG did not conduct an investigation.  Eudell next cites to an incident in September 1995, when coworker Dana Caza, who was on setup duty, became angry at Eudell for requesting that he make adjustments to Eudell's machine. Eudell states: "Instead of performing his job function as a machine setup person, Caza got hold of a large piece of cardboard and wrote, 'Just Do It – 19 cents/hour.' This was probably in reference to a Nike T-shirt that I was wearing."  Eudell further

states that "[t]hereafter, co-workers placed a Buy American bumper sticker at the break table where I generally sat."  According to Eudell, although supervisor Bill Mahlem "ripped up the cardboard and had someone scrape off the bumper sticker, no investigation was commenced and those responsible were never found let alone charged."

Next, Eudell relates an incident in late 1995 when a coworker accused him of "stealing parts," an offense that could lead to termination.  He explains that stealing parts occurred when an employee turned in more parts than he/she was given on that shift, apparently indicating that the worker "shaved" parts from other orders and used those parts to boost his/her daily count.  He avers in his affidavit that the allegation was quickly made public; that coworkers would repeatedly check the counter on his machine to note the number of pieces; that he "became angry and confused about the strict scrutiny of my job performance by coworkers"; and that "no White employee was made to endure such treatment in the department."  NVG investigated and found he had not stolen parts.  Eudell adds: "Foiled in their attempt on the trumped up charge of stealing parts, the co-workers and supervisors caused another investigation to be initiated because I would finish my job before the end of the shift. This investigation proved fruitless as well."

Eudell avers that in 1996, area manager George March instructed third shift supervisor Bill Mahlem to change an excused absence in Eudell's attendance record to an unexcused absence. Eudell states that he "protested the change, and after the original supervisor who granted the leave to me admitted that he had excused the absence, the mis-designation was corrected."

Not long thereafter, in September 1996, supervisor Bob Gale issued a written reprimand against Eudell for not wearing safety glasses going from the work station to the break area. Eudell states: "Other workers, who were White, were not similarly treated for such a minor infraction."

-83-

During the next month, Gale issued a series of performance related citations to Eudell.  In one incident in October 1996, Eudell was accused of using a key to override his machine's automated safety processes and was threatened with suspension.[14]  He claims that before he began his shift, he reported to Gale that someone had left a key in the machine; that a couple of hours later a union steward said he heard Eudell was going to be suspended for running the machine with the key; that a few days later, a coworker, Sean Burke, apologized for leaving his key in the machine; and that Burke was not threatened with suspension but was told simply "not to do it anymore." Eudell states: "At a minimum, I was threatened to be suspended when the supervisor and the area manager believed that I was responsible for using the key.  In contrast, Sean Burke, a White co-worker, was merely warned—hardly an equal disciplinary response."  And NVG took no action against Gale for "falsely accusing [Eudell] of the infraction[.]"  Eudell further claims that in October 1996, Gale issued an unwarranted written reprimand against him for refusing to run a machine "that had been improperly set up" and for saying he would operate the machine only if Gale gave him an "AVO," a written order that would have cleared Eudell from blame if the machine or its pieces was defective.

Eudell complains of abusive tirades by Joe Zullo, Eudell's supervisor beginning in November 1996.  Eudell does not, however, relate any statements by Zullo that had a racial element.  Two coworkers, Reginald Hereford (race unknown) and Walter Johnson (apparently a

---

[14]

Eudell explains:

> The key, when turned to the on position, permitted an operator to run equipment with the doors open while the machine was still in motion. This allowed the worker to move faster and to produce more pieces. However, for safety reasons, NVG and the Union agreed that if an employee was caught doing this, then there would be severe disciplinary action taken. All three shifts had to sign a document to that effect.

black man), testified that Zullo used vulgar language when speaking to all employees, white or black.  Eudell further states that in April 1997, he told Zullo he had been "verbally abused long enough and would not take it any longer."  In the following month Zullo wrote him up seven times: six times for poor job performance, and once for a wandering-related offense.  In this regard, Eudell states:

> According to NVG's motion, I had been written up nine times for performance issues; six of these happened in a twenty three day period out of four years. No White co-worker in the department was similarly written up by Zullo. The citations painted me in a false light.
>
> Indeed, an examination of the six citations for performance issued in April 1997, shows that they were judgment calls, akin to a umpire calling a runner safe on a close play. The citations issued the previous year were very specific, such as producing oversized parts, and akin to calling a batter out when his pop up is caught by the second baseman.
>
> In April/May 1997, I was placed on light duty. Although Bill Washington was the supervisor in that area, Zullo made it his business to monitor my every move. If I returned back from a break, and in his opinion I was late, I would be reprimanded or written up. In contrast, the White co-worker from Zullo's department, who was also on light duty, and who would also return with me on those occasions, was never written up.

Eudell claims that as a result of the stress of these problems, he was taken out of work by his physician in May 1997 for "mental anxiety and stress disorder."  In July 1997, his doctor released him to return to work provided that he was placed away from Zullo or moved to a new department or job.  At first NVG placed Eudell back under Zullo; however, later in July 1997, after speaking with Owen McGraw in NVG's Human Resources Department, Eudell was transferred to a new department.  Eudell opines: "Had I been white, no doubt the transfer would have occurred without me asking."

Other allegations include:

-85-

In July 1998, I purchased a six years old Mercedes Benz. For many White co-workers, this was the final straw. The haranguing about the Mercedes, my fancy clothes, and my "attitude" by White co-workers made me feel like the stereotypical black pimp.

At the plant, it was customary for employees to make use of a service bicycle to get from one area to another. However, I was told by Supervisor Chris Kowalski not to "ever get on the bike again" because co-worker Wes complained about my being on it.  No White co-workers in the department were similarly treated.

Eudell avers that on or about August 23, 1998, he was reprimanded by supervisor Kowalski for not completing a job given to him by Wes, a coworker.  According to Eudell, "Wes made his opinion of Blacks no secret. He has placed a confederate flag on his toolbox as an insignia of his beliefs."  Eudell responded to Kowalski that Wes was not a supervisor and adds: "I explained that I was aware of how Wes felt about me because of my race. I told him that Wes' confederate flag insignia created a hostile work environment for me."  Eudell alleges that Kowlaski replied, "that's your problem not mine. And, any time Wes tells you to do something it is a direct order from me."

According to Eudell, racial jokes were told "on a regular basis" in his department, particularly by coworkers Wes and Mark Murray "with no fear of being reprimanded as management was present and laughed as well."  He relates two jokes:

Joke 1: Local Shoe Company was laying off all the black loafers.
Joke 2: There was a plane in the air and it was going to crash because it was too heavy. So the pilot asked the flight attendant to see if anybody would jump off to save the plane starting with nationalities that begin with the letter "A". So a little boy asked his father, "daddy, daddy does that mean us?" And the father said "no." The plane still being heavy, the pilot then asked the stewardess to start to go and ask people who would jump off with the nationality that starts with "B." The little boy asked "if that was us", and the father replied no. Then the pilot and stewardess went through with nationalities with C. So the boy asked if that meant us, and the father said "today we are not colored, today we is niggers."

-86-

When asked about these jokes in his deposition, Eudell stated that these two jokes were told by Murray; that Murray "told at least two" such jokes in Eudell's presence; that other white employees were present; that after Murray told the airplane joke Eudell "walked away with disgust"; and that Eudell never reported Murray's jokes. Eudell does not refer to any other jokes, nor does he assert in his deposition that anyone was present except coworkers.

Eudell's affidavit also describes in further detail two incidents set forth in the complaint: McGraw's warning to "watch his back" while on disability leave, and Eudell's refusal to run a machine without an AVO on February 27, 1999. He adds that his toolbox was stolen in April 1999, but NVG did not investigate. With respect to his reference in the second amended complaint to racial material on a bulletin board, his affidavit states that he "witnessed racial propaganda that had been posted on a bulletin board pandering to the stereotypes that we all drink Kool Aid, and eat fried chicken. The discriminatory material was not removed immediately, but lingered until I pulled it down and showed it to a Supervisor Kowlaski who did nothing." When asked about the item in his deposition, he stated: "It didn't have any pictures. It was just a comment saying, you know you're a southerner when you do or say the following." He concludes: "After four years of racial hostility, I resigned from NVG on or about June 1, 1999."

In NVG's reply, regarding Eudell's complaints regarding his tool box, clothing and car, NVG contends that there is no evidence that the incidents had anything to do with race discrimination. John Keller, plant security director, states in his affidavit that Eudell complained to him about the vandalization of his tool box and the comments about his car, but not under circumstances having to do with racism. Keller states that he instructed a department supervisor to investigate the vandalization of Eudell's toolbox and that such vandalism "was unfortunately a

-87-

common occurrence in the plant and experienced by employees of all races."  Keller also explains that to the extent co-workers may have been "picking on" Eudell it was because he drove a foreign car and wore foreign made clothes during a time when "Buy American" sentiments were strong.  Keller adds that NVG "was very insistent on the concept that employees drive what we build" and that "[i]t was not uncommon for notes reading 'Buy American' to be left on employees' foreign cars."

*Discussion*

In addressing the totality of the circumstances alleged by Eudell in support of his hostile workplace claim, the Court first considers the specific allegations of overtly race-related incidents occurring during Eudell's employment at NVG's plant.  The first is the incident on August 23, 1998, when supervisor Kowalski reprimanded him for not completing a job given to him by Wes, the coworker who "made his opinion of Blacks no secret" and "placed a confederate flag on his toolbox as a insignia of his beliefs."  Although Eudell responded that Wes was not a supervisor and that his confederate flag created a hostile work environment, Kowalski replied: "That's your problem not mine. And, any time Wes tells you to do something it is a direct order from me."  The second allegation specifically related to race is Eudell's statement that racial jokes were told "on a regular basis" in his department, particularly by coworkers Wes and Mark Murray "with no fear of being reprimanded as management was present and laughed as well."  Eudell relates two jokes, and makes no effort to amplify what he means by "a regular basis."  Third, he states that he "witnessed racial propaganda that had been posted on a bulletin board pandering to the stereotypes that we all drink Kool Aid, and eat fried chicken."  Apparently Eudell is referring to a single incident, because he adds that the material "was not removed immediately, but lingered

until I pulled it down and showed it to a Supervisor Kowalski who did nothing." Eudell's

deposition testimony, however, indicates that the item was a joke about southerners, not blacks.

In a number of other incidents, the purported racial element is based on pure speculation.

For example, regarding the instances in which coworkers teased him about having a Geo Prism

vehicle, he states that "the continual references to 'Geo Bob' by ... co-workers, all of whom were

White, had to be about me as a Black man in the department because the Geo ... was not a foreign

car." He also states that, after he bought a Mercedes Benz in July 1996, "[t]he haranguing about

the Mercedes, my fancy clothes, and my 'attitude' by White co-workers made me feel like the

stereotypical black pimp." With respect to the incident on October 19, 1994, when Forderkonz,

the set-up man, allegedly blamed Eudell for a problem with his machine, yelled at him, and had to

be restrained from attacking him, Eudell states that the supervisor present took no action and that

"it seemed that he believed that I, as a Black man, was uppity." Eudell further states in

connection with the vandalization of his toolbox in early 1995: "I suspected that the attack was

racially motivated and in retaliation for my complaints, as nothing was stolen from the toolbox, it

was just vandalized."

Similarly, the purported racial elements to incidents described by Eudell as reflecting a

racially disparate dual system of discipline are based on pure speculation. For example, after

relating that he had to ask Owen McGraw to transfer him out of Zullo's department, he states:

"Had I been white, no doubt the transfer would have occurred without me asking." Referring to

McGraw's suggestion that he "watch his back" while on disability leave, Eudell states that he

"believes that comparably situated White employees do not face such attacks on their credibility

when returning to work following absences based on work related mental or emotional

-89-

disabilities."  He complains that after he was accused of stealing parts, coworkers repeatedly checked the counter on his machine, and that "no White employee was made to endure such treatment in the department."  Likewise, with respect to the September 1996 incident when supervisor Bob Gale reprimanded him in writing for not wearing safety glasses, Eudell asserts that "[o]ther workers, who were White, were not similarly treated for such a minor infraction."  In none of these cases does Eudell adduce any evidence regarding any white coworker involved in a comparable incident.

In support of his claim of a dual system of discipline, Eudell further complains that he was threatened with suspension when he was suspected of leaving a key in the machine, whereas the white employee who actually did leave the key was only reprimanded.  However, the hearsay statement that a union steward said he heard that Eudell was going to be suspended for the suspected infraction is not competent proof that Eudell was threatened with suspension.  Nor is there evidence that the white employee's situation was comparable to Eudell's in other respects, such as his disciplinary record.  And, in connection with the six written reprimands issued against him by Zullo, Eudell states only: "No White co-worker in the department was similarly written up by Zullo."  Absent evidence that white coworkers had committed similar infractions, had similar disciplinary records, and/or were otherwise comparable to Eudell, this assertion does not support a claim of racially disparate discipline.

Indeed, with respect to the discipline meted out to him, Eudell does not dispute the number of disciplinary actions taken against him as set forth in Quinn's affidavit.  He does claim that six of the nine performance-related write-ups were written by Zullo in the 23-day period after he told Zullo in April 1997 that he had been "verbally abused long enough and would not take it

any longer."  He claims that these writeups were "judgment calls" but does not claim that the

incidents did not occur.  Nor does he deny returning late from breaks, although he states: "If I

returned back from a break, and in his opinion I was late, I would be reprimanded or written up.

In contrast, the White co-worker from Zullo's department... who would also return with me on

those occasions, was never written up."  Again, there is no showing that the white coworker was

comparably situated to Eudell.

The remainder of the incidents alleged by Eudell have no racial element whatsoever.

Examples include the January 1995 incident when Eudell had showered and dressed in a suit

before the end of his shift, and Forderkonz angrily commented on his "hot-shot clothes"; the

September 1995 incident when a machine setup person, Caza, wrote "Just Do It – 19 cents/hour"

on a piece of cardboard – Eudell states that this "was probably in reference to a Nike T-shirt that I

was wearing"; the incident in 1996 when an excused absence in Eudell's attendance record was

changed to an unexcused absence and then later corrected; and the October 1996 incident when

supervisor Gale issued a written reprimand against him for refusing to run a machine "that had

been improperly set up."  Eudell also complains of abusive tirades by Joe Zullo, Eudell's

supervisor beginning in November 1996; Eudell does not, however, relate any statements by

Zullo that had a racial element.

In sum, Eudell claims that, over a five-year period of employment in a manufacturing

plant employing thousands of people, he was required to take orders for an unspecified period of

time from one coworker who had a confederate flag on his toolbox, that he heard race-based jokes

at an unspecified rate of frequency (he relates only two), and that on one occasion he saw

something on a bulletin board "pandering to the stereotypes that we all drink Kool Aid and eat

fried chicken," although from Eudell's deposition it appears that "we" refers to southerners, not blacks.  He does not allege that anyone ever made an explicitly racist comment about him or any black coworker, or that a racial epithet was ever directed to him or any black coworker.  He presents no evidence on which a reasonable factfinder could conclude that the teasing about his clothing or his car was based on his race.  Nor, with respect to his many complaints about how he was disciplined, does he present any evidence that would permit a reasonable factfinder to conclude that the disciplinary actions were motivated by racism.  In fact, he acknowledges refusing to follow supervisors' direct orders on at least two occasions, and in general does not deny that the incidents for which he was disciplined occurred.  He presents no competent evidence that any comparably situated white employee was treated more favorably in any respect.

      The Court concludes that the evidence adduced by Eudell, viewed in its totality and in a light most favorable to him, would not enable a reasonable jury to conclude that his workplace was objectively hostile, that is, that it was permeated with racially discriminatory intimidation, ridicule, and insult that was sufficiently pervasive to alter the conditions of his employment.  He has failed to show that the very few racially-related incidents (the coworker's confederate flag insignia, the jokes, and possibly the item on the bulletin board) were severe or pervasive, or that they amounted to more than a few isolated incidents.  Nor has he presented evidence upon which a finder of fact could conclude that the other incidents of which he complains, which are not overtly race-related, were in fact related to his race.  As such, the record does not support a finding that he was subjected to an objectively hostile work environment due to his race.[15]

--------------------------------------------------

[15]

For purposes of the motion, the Court accepts that Eudell subjectively perceived the work environment to be hostile.  Thus, the Court does not consider the report submitted by psychologist

Summary judgment dismissing his racially hostile work environment claim is granted.

To the extent that Eudell's submissions may be read to state a claim for constructive discharge, the claim lacks merit as a matter of law.  He fails to present evidence on which a reasonable factfinder could conclude that NVG deliberately and discriminatorily created work conditions so intolerable that a reasonable person in his position would have felt compelled to resign.  *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006).

**Retaliation**

In support of his retaliation claim, Eudell's Memorandum of Law specifies only one allegedly protected activity and causally-related adverse employment action: his statement to Zullo in April 1997 that he had been "verbally abused long enough and would not take it any longer," followed by seven write-ups by Zullo within a month thereafter.  There is, however, no evidence that Eudell's statement to Zullo was a protected activity, because there is no evidence that it was reasonable for Eudell to believe that Zullo's alleged verbal abuse was racially-motivated.  Nor has Eudell shown a basis for concluding that Zullo's write-ups were not warranted but were actually a pretext for retaliation.

Eudell urges that there were numerous other instances of retaliation.  He does not articulate these alleged instances, but merely states in his Memorandum of Law that he "complained numerous times to his supervisors and to management concerning the ill-treatment [at] NVG"and that NVG "retaliated against him through the issuance of write-ups, suspensions, investigations, surveillance, and failure to allow him to cross-train in his department."  He does not specify which allegedly protected activities gave rise to which allegedly retaliatory actions.

---

Daniel Kadish.

In any event, most of Eudell's complaints to his superiors do not constitute protected activities, because there is no evidence that it was reasonable for Eudell to believe that the matters complained of were racially-motivated.  Further, some of his conduct, such as refusing to follow the direct order of a supervisor, was not a protected manner of protesting discrimination.  Nor has he presented evidence that the various disciplinary actions and other adverse actions were not warranted but were actually a pretext for retaliation.  And finally, Eudell's submissions fail to support a finding of a causal connection between any of the various complaints he made to his superiors and any of the various adverse employment actions on which he relies.  NVG's motion insofar as it seeks dismissal of Eudell's retaliation claims is granted.

**State law claims**

New York's Human Rights Law discrimination claims are evaluated by the same standard as Title VII and section 1981 claims.  Thus, Eudell's state law discrimination claims are dismissed for the same reasons as his federal claims, discussed above.

In his Memorandum of Law on this motion, Eudell does not oppose dismissal of his claims for intentional and negligent infliction of emotional distress.  Thus, they are deemed abandoned and dismissed.  In any event, they lack merit and are barred by New York's Workers' Compensation Law.

**Conclusion – NVG's motion**

Finally, to the extent the second amended complaint may be read to state a claim on behalf of Eudell against NVG for breach of the collective bargaining agreement, it lacks merit for the reasons set forth above.  Moreover, having been pled for the first time in the second amended complaint, it is time-barred.  *See McKee v. Transco Prods., Inc.*, 874 F.2d 83, 86 (2d Cir. 1989).

-94-

NVG's motion insofar as it seeks summary judgment dismissing Davis' claims against it is granted in its entirety.

**The union's motion**

Eudell submitted a notice (Dkt. No. 165) stating that he does not oppose the union's summary judgment motion.  Summary judgment is granted dismissing his claims against the union.

## CONCLUSION

It is therefore

ORDERED that the motion to sever (Dkt. No. 137) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. is denied as moot; and it is further

ORDERED that the motion for summary judgment (Dkt. No. 139) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. is granted on the merits; and it is further

ORDERED that the motion for summary judgment (Dkt. No. 140) by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America, is granted on the merits; and it is further

ORDERED that the second amended complaint (Dkt. No. 39) is dismissed in its entirety.

IT IS SO ORDERED.

January 22, 2008
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge